[No. 8341.]

## MCBRIDE V. THE PEOPLE.

CRIMINAL LAW—*Fair Trial*. Information for obtaining money by false pretenses. The only testimony for the People was that of the prosecuting witness, flatly contradicted by the accused. There was no corroboration of either. Irrelevant testimony, highly prejudicial to the accused, was received, and the assistant district attorney, in his argument to the jury, indulged in injurious reflections upon the conduct of the accused, unwarranted by the testimony. The court neither rebuked the attorney nor directed the jury to disregard the injurious statement. *Held* that the accused had been deprived of his constitutional right to a fair trial. Judgment reversed. (441, 442, 449.)

*Error to Denver District Court.* . Hon. Chas. C. BUTLER, Judge.

Mr. GREELEY W. WHITFORD, Mr. HUBERT L. SHATTUCK, Mr. E. M. SABIN, and Mr. WARREN A. HAGGOTT, for plaintiffs in error.

Hon. FRED FARRAR, Attorney General, Mr. WENDELL STEPHENS, and Mr. RALPH E. C. KERWIN, Assistant Attorneys General for The People.

Mr. JUSTICE SCOTT delivered the opinion of the court.

The information in this case charged the plaintiff in error in three counts. The first count charged the defendant with obtaining the sum of eleven thousand two hundred and seventy dollars by means of false pretense. The second count charged the obtaining of such sum by means of a confidence game, and the third count charged the larceny of the amount. Upon motion of defendant, the court withdrew the second and third counts from the consideration of the jury.

The first count of the information, upon which the defendant was tried, is as follows:

"Comes now John A. Rush, District Attorney within and for the Second Judicial District in the State of Colorado, and in the name and by the authority of the People of the State of Colorado informs the Court and gives the Court to understand that W. R. McBride, on to-wit, the twenty-second day of April, in the year of our Lord nineteen hundred and thirteen, at the City and County of Denver, in the State of Colorado, with intent to cheat and defraud another, to-wit, Joseph Cox, did then and there falsely and feloniously pretend and represent to the said Joseph Cox, that one A. L. Welsh was then and there the owner of ninety- eight shares of the capital stock of the Night and Day Bank of Denver, in the State of Colorado, a corporation, of the value of eleven thousand two hundred and seventy dollars, and that he, the said McBride, had full power and authority from the said A. L. Welsh to negotiate, sell and transfer and dispose of said ninety-eight shares of stock as he, the said McBride should see fit, for said A. L. Welsh, for the said sum of eleven thousand two hundred and seventy dollars; and the said W. R. McBride did then and there offer to sell and transfer and deliver said stock so described as aforesaid to the said Joseph Cox for the said sum of eleven thousand two hundred and seventy dollars as aforesaid, and the said Joseph Cox then and there believing the said false and felonious pretenses and representations so then and there made

by the said W. R. McBride, and relying thereon, and being deceived thereby and being induced thereby did then and there purchase said ninety-eight shares of stock from the said W. R. McBride, and did then and there pay and deliver to the said W. R. McBride, for said ninety-eight shares of stock the sum of eleven thousand two hundred and seventy dollars of the check, draft and bill of exchange of the said Joseph Cox, of the personal property of the said Joseph Cox, and the said W. R. McBride, did then and there feloniously, fraudulently, designedly and knowingly by means of the said false and felonious pretenses and representations afore-said, obtain from the said Joseph Cox, the said check, draft and bill of exchange of the said Joseph Cox, of the value of eleven thousand two hundred and seventy dollars, of the personal property of the said Joseph Cox, with intent to cheat and defraud the said Joseph Cox, whereas in truth and in fact, the said A. L. Welsh was not then and there or at any other time the owner of ninety-eight shares of the capital stock of the Night and Day Bank of Denver, in the State of Colorado, a corporation, of the value of eleven thousand two hundred and seventy dollars or any other sum, or any other number of shares of said Night and Day Bank or any shares whatever of said Night and Day Bank at said time or at any other time as he the said W. R. McBride well knew. That the said McBride did not have on to-wit, the 22d day of April, 1913. or at any other time, power and authority from the said A. L. Welsh or any other person to negotiate, sell, transfer, endorse, encumber or dispose of said ninety-eight shares of stock or any part thereof as he should see fit, for the said A. L. Welsh, or any number of said shares, for and in consideration of the sum of eleven thousand two hundred and seventy dollars, or in any other sum or in any manner whatsoever, as he the said W. R. Mc-Bride at all times then and there well knew contrary to the form of the statute in such case made and provided, and

against the peace and dignity of the people of the State of Colorado."

The defendant was convicted and brings the case here for review.

There are many assignements of error, but we find it necessary to consider only, the admission of incompetent and prejudicial testimony, and the misconduct of the district attorney.

The defendant was at the time of the transaction, the president and in control of the Night and Day Bank, a state banking corporation, doing business in the City of Denver. The prosecuting witness was a depositor and stockholder in said bank.

The prosecuting witness, Cox, testifies that on or about the 22d day of April, 1913, the defendant represented to him that there was a man living either in Oklahoma or Texas by the name of A. L. Welsh, who was the owner of ninety-eight shares of the capital stock of the Night and Day Bank, which he wanted to sell, and had asked the defendant to find a purchaser for him, at the price of one hundred and fifteen dollars per share.

That defendant represented the stock to be worth the price asked and induced him, Cox, to agree to purchase the same. That he thereupon gave his check upon the Night and Day Bank for the amount of the purchase. The check cashed, was drawn to A. L. Welsh, and delivered to the defendant who endorsed the name of Welsh upon the back of it, and with his own name thereunder, and placed the amount to his own credit in the bank.

It is agreed that there was no such person as Welsh, who was at the time, or at any other time, the owner of stock in the Night and Day Bank.

The defendant testifies as to the transaction, that he and Roy Cox, a son of the prosecuting witness, had on the 5th day of April, 1913, jointly contracted to purchase a con-

trol of a bank at Yampa, Colorado, and for which they had
agreed to pay the sum of $14,760. That this agreement
was with the advice and consent of Joseph Cox, who had
agreed to pay one-half thereof for his son, and to loan to
the defendant the money with which to pay for his half
interest. This transaction was closed on the 21st or 22d
day of April, and the total of $14,760 placed to the credit
of the Yampa bank, with the Night and Day Bank. This
sum either at that time or at different times prior, was
charged against the account of Joseph Cox.

The defendant says that on the said 22d day of April,
he had purchased a control of a bank at Littleton, Colorado,
and that he told Cox of this, and also, that he did not have
sufficient funds with which to make his full payment for the
Littleton bank stock, and, that it would require eleven thous-
and dollars to cover the sum needed to complete his Littleton
purchase, and to pay for his share of the Yampa purchase.
That he asked Cox for a loan of this amount; that Cox said
he did not have enough money to his credit to make a loan
of that amount and also to make another loan of $2,500
which he had promised. But finally said he would cash a
note of five thousand dollars, and still later, said that he
would borrow the five thousand dollars from another bank
in the city. That defendant said to him that the Night and
Day Bank would loan Cox the five thousand dollars, where-
upon Cox executed his note to the bank in that sum, which
was at once placed to his credit, and he thereupon issued
the check for eleven thousand two hundred and seventy
dollars involved in this proceeding.

The defendant testifies that during the conversation he
said to Cox, that he had ninety-eight shares of his stock in
the Night and Day Bank pledged with a Kansas City Bank,
and proposed that the sum to be thus loaned by Cox to him,
should be paid in these shares at the price of $115.00 per
share, as soon as he could get the stock released, to which

Cox finally agreed, and with this understanding the advance was made, to an amount equalling the value of the stock at the price of $115.00 per share.

He says further, that he gave Cox at the time, his promissory note for this amount. This, Cox denies. The defendant further testifies that a check for this sum drawn directly to defendant was first signed by Cox, but that later, defendant thought that it would look bad on the books of the bank for him to have made Cox a loan of five thousand dollars from the bank, and have Cox then make the larger loan to defendant, and that after talking this phase of it over with Cox, it was agreed between them that the first check should be destroyed and another check should be written as it finally was. The giving of this first check is also denied by Cox. Defendant says that he did not mention the name of Welsh as being the owner of any bank stock or at all, and that he simply wrote the name of Welsh in the check as he would have written any other name to accomplish the purpose they had in mind, viz, to avoid the appearance of his, the defendant, indirectly borrowing from the bank.

The gist of the offense charged, was fraud upon Cox in inducing him to part with his money upon the representation by the defendant, that he was selling to Cox, bank stock, the property of Welsh. If Cox's testimony as to this transaction is true, the defendant was guilty, if the defendant's testimony was true, Cox was not deceived, and the defendant was not guilty.

There is substantially nothing in the record to corroborate either the prosecuting witness or the defendant, upon the question of the alleged fraudulent representations. It is a case of one witness against the other. While this was a matter for the jury, yet in a case where the burden was upon the people to prove the defendant guilty beyond a reasonable doubt, it raised so close a question for the jury as to not permit unfairness in the admission of incompetent

testimony, or in the misconduct of the district attorney, or errors of law upon the part of the court, even in slight degree. For who can say that an error in either particular, however slight, may not have influenced the jury against the defendant in so close a case.

Whatever we may say of the conduct of the defendant as cashier of the bank, in having a check drawn to a stranger and in endorsing that stranger's name thereon, followed by his own, the only question here is, was the prosecuting witness deceived and defrauded in the transaction.

That Cox agreed to and did, advance to the defendant $7,380 with which to make payment for his share in the Yampa bank, and that the defendant was thus indebted to Cox in this amount at the time the alleged fraudulent check was signed, and which sum it covered, is quite strongly corroborated.

That Cox desired his son to enter the banking business, and approved the purchase of the bank control at Yampa; that the son drew a check while at Yampa, signing his father's name, and for the full amount of the purchase, and delivered it to the seller of the stock, though the check was not finally used, and that this action was made known to the prosecuting witness, who approved it, is a circumstance.

That Cox drew and delivered to the defendant his check for $7,380 on the 18th day of April, just before the Yampa deal was closed, payable to the order of defendant, is evidenced by the check itself, is another circumstance. While this check was not used, but a credit slip by defendant in the precise amount was used, as appears from the record, yet the circumstance remains.

As soon as the Yampa deal was closed, Roy Cox became cashier of that bank, and so remained until sometime in October, when the shares purchased by McBride and himself were sold. And during that period or until the bank

commissioner ordered otherwise, the Denver account of the Yampa bank was kept with the Night and Day Bank.

Again, on the 31st day of October, 1913, or more than six months after the alleged fraudulent transaction, the prosecuting witness loaned the defendant, the sum of $16,-830 on his personal note, which is in evidence, and in order to be able to do this, cashed a note payable to him by the Colorado Fuel and Iron Company, before its maturity. Further, while defendant asked to borrow only $15,000, yet Cox turned over to him the entire proceeds of his note, $16,830, and took defendant's promissory note therefor.

Cox says that the defendant asked him for the loan of the money in order to be in position to sell the Night and Day Bank, and that he only wanted the money for a few days. The bank was sold on the 4th day of November, or four days after, and its solvency is not questioned.

Further, it is not denied that a list of the stockholders of the Night and Day Bank was posted in the bank, nor that defendant gave Cox personally a list of the stockholders before the alleged fraudulent transaction, and the People clearly proved that Welsh never was or appeared to be a stockholder in the concern. Again, the prosecuting witness testified that he received his bank statements and cancelled checks not later than the fourth day of each month, and that he received the check involved here, in due course. He thus had this check in his possession nearly six months before he loaned the defendant the $16,800. The query naturally arises, if he did not receive the stock he alleges he purchased, and if he did not know how the check was drawn and endorsed at the time, why, in all the long period that he held the paid and cancelled check, did he not examine it, and learn the fact of what he now claims was a fraud upon him. Outside of his own oral testimony, this check was the only legitimate incriminating evidence against the defendant, and

Cox had the check with its endorsements, in his possession not more than twelve days after it was written.

All these circumstances, together with the faulty memory of Cox, clearly apparent in his testimony, are sufficient to raise a question in fair minds as to the reliability of his statements, when wholly uncorroborated.

It appears that the defendant was an owner of stock in an Oklahoma bank, and of the control of the Night and Day Bank, of the Oak Creek Bank, and later, of the Yampa and Littleton banks.

The testimony as regards all these, indicates an absence of conservatism, if not a tendency toward chance and speculation, upon the part of the defendant, and it is the admission of such testimony that forms the basis of unfairness upon this trial.

Such testimony is very likely to prejudice a jury against one charged with the specific offense in this case, and he is entitled to be duly safeguarded therefrom, when such testimony is not properly applicable. This applies especially to testimony concerning the purchase and sale of the bank at Yampa. This was gone into in minute detail and at great length, without even remote bearing upon the alleged fraudulent transaction. This is illustrated by the testimony of Roy Cox on direct examination by the district attorney, extracts from which are as follows:

Q. You went into a bank in Yampa, didn't you? A. Yes, sir, I did.

Q. Where was that, Yampa, Colorado? A. Yampa, Colorado.

Q. Kindly explain to the jury that transaction? A. Why McBride and I left here; I forget just what date it was, and went up there, and we looked the bank over and so McBride says to me, he says, you make out the full amount of the check, my check is not here, and I will fix it up with you

when we get back down in Denver, and I gave him fourteen thousand and some odd dollars, I forget just what it was.

Q. How much were you to purchase that bank for? A. $180 a share.

Q. How many shares were there? A. Eighty-two.

Q. Eighty-two shares at $180 a share? A. Yes, sir.

Q. How much were you to put up? A. I was to put up half.

Q. Do you know how much half was? A. $7,380, I think it is.

Q. How much was Mr. McBride to put up? A. The same amount.

Q. And what did he say to you as to the amount to put up? A. What did he say?

Q. What was the conversation with reference to how you should pay for that bank? A. McBride says, now, Roy, you pay it for a while, finish it up in one transaction, instead of me giving half and you giving half for it, we will just finish it up in one check.

Q. What do you mean by finish it up? A. Make it one check.

Q. Who was to give that check? A. I was. It was not a check, it was a draft, or something.

Q. I show you a paper marked exhibit D; state whether or not you ever saw that exhibit before? A. Yes, sir, I did.

Q. Is that your signature? A. Yes, sir, that is.

Q. Who filled in the amount, fourteen thousand seven hundred sixty dollars? A. Why, McBride.

Q. What was done with this draft? A. Handed over to Charlie Stone.

Q. Who is Charlie Stone? A. He was the former cashier and owner of that Yampa bank.

Q. Now what was the conversation with Mr. McBride as to how he would pay for the shares that he should pay

for?   A.   As soon as he got to Denver he was to deposit to my father's credit.

Q.   This $7,380?   A.   Yes, sir.

Q.   And this draft was dated 4-5-1913?   A.   That is about it.

Q.   That is the day that you purchased that bank?   A. I wouldn't say—if that is the same thing it is the same date, that was the date I purchased, Mr. McBride and I purchased the bank.

Q.   'Joseph Cox, per Roy Cox?'   A.   I wrote that myself.

Again having reference to the $14,760 so executed by Cox at Yampa, the district attorney offered the following testimony:

"Q.   Do you know whose signature that is on the back? A.   Yes, sir, that is Charlie Stone's signature.

Q.   And on the back of exhibit D. is 'Chas. Stone,' also 'Pay to the order of the Denver National Bank, Denver, Colorado. All prior endorsements guaranteed. The Bank of Yampa, Yampa, Colorado, 82-194, C. S. Stone, Cashier,' and in red ink on the face of exhibit D., 'this is to certify that the amount is in the Night and Day Bank to meet this check, W. R. McBride, President.' At the time you state that check was given in payment for the bank, did Mr. McBride return to Denver?   A.   We did.   Both of us.

Q.   And it was at that time, after the return, that he was to credit $7,380 to your father's account?   A.   He was, yes, sir.

Q.   Did you afterwards, Mr. Cox, sell that bank?

Mr. Sabin.   I object to that as immaterial, whether he did or not.

The Court.   I don't quite understand how that is relevant.

Mr. Mahoney.   It is relevant to this extent: They went into the Yampa transaction, and I want to show that they

sold the bank, this boy sold it, and $7,000 was returned to him and $7,000 to McBride showing that McBride was to put up half of the money, and that he did, in compliance with that deposit that he made to put up half the money. That thereafter they sold it, half to go to Cox and half to McBride, and that Roy Cox gave the $7,000 and that he received McBride's note for it, and that McBride took the $7,000 and used it, going to show that he was to pay half and Cox was to pay half.

The Court. I think you may go into it to this extent: Ask him if he sold the bank and how he divided the money, without going into details.

Q. The bank was sold, was it? A. Yes, sir.

Q. How much was it sold for?

Mr. Sabin. I object to that.

The Court. Objection sustained. You may ask him how it was divided.

Q. How was the purchase money divided? A. McBride took half and I took half, and Mr. Stone wrote out checks on different banks, and I signed my signature to these checks, what I mean is, endorsement, and McBride told me when the money returned—I saw McBride write out a check and place it half to my credit.

Q. How much was half? A. We sold out for—

Mr. Sabin. I object to that.

The Court. Objection sustained.

Mr. Mahoney. I think it is clearly proper to show to the jury the entire transaction.

The Court. I cannot see how it is material.

Mr Mahoney. To show how much half was, how much this boy got and how much McBride got, that he paid this check of $14,760, and that he gave the whole check, in compliance with McBride's statement, and McBride was to credit to his father's account half of this, going to show that McBride got half of it.

The Court. He has stated he got half.

Mr. Mahoney. Yes, but he didn't state the full amount that it was sold for."

The check referred to was in fact never paid and did not constitute a part even of the Yampa transaction as finally consummated. All this testimony had no relation whatever to the transaction with which the defendant was charged, and together with the statements made at the time, by the district attorney, in the presence of the jury, was clearly prejudicial to the defendant.

The bank commissioner was permitted to testify:

Q. Now, you stated that you told Mr. McBride that he could not get any more money from Mr. Cox if you could help it? A. Yes, sir.

Q. What brought up that conversation? A. In the office of the department a matter was coming up with reference to the Night and Day Bank, with reference to the settlement of a claim made by a Chicago bank against that bank, and I called Mr. McBride up with reference to that, to tell him about that, that they were demanding a settlement of this claim, and in some way he made some statement that I do not clearly recall, and I said to him, I do not think that I will permit you to get any money from Mr. Cox, if I can help it and he fired back some response, and later came up to the office, where I repeated the remark.

Q. Now, at the time that you made the examination of this bank, was Mr. McBride the owner of 300 shares of stock? A. Mr. McBride was the owner, or controlled, approximately 350 shares of stock of the bank, on October 7th.

Q.. And where was that stock?

Mr. Sabin. I object to that as immaterial, and not proper redirect examination.

The Court. Objection sustained.

Mr. Mahoney. I want to show, if the court please, that this stock was hypothecated, it was not in his possession.

Mr. Sabin. I object to that statement.

The Court. There was nothing gone into on that on direct examination.

Mr. Mahoney. I ask leave to go into it now.

The Court. If he knows, he may answer.

Mr. Sabin. Save an exception.

Q. Did you make an examination of the books of the bank? A. Yes, sir.

Q. Do you know whether or not the shares of stock that Mr. McBride did hold were under his control, or whether or not they were pledged or hypothecated, or were held with other banks? A. My recollection is that with the exception of three shares that Mr. McBride held free, all of the remainder were pledged."

This testimony could clearly have no other purpose than to prejudice the defendant in the eyes of the jury.

The offense charged was as against the defendant in a personal transaction. It could not and did not involve the solvency of the Night and Day Bank; nor transactions with other banks. Indeed, the record does not justify even an inference that either that bank or any other bank with which the defendant was connected, was then or at any subsequent time, insolvent.

Error is urged because of the misconduct of the district attorney in the matter of prejudicial statements in his closing argument, but neither the argument nor the parts thereof complained of, are preserved in the bill of exceptions, and under the rule of this court may not be considered.

But the following does appear in the bill of exceptions as occurring at the time of the argument by the district attorney:

"Mr. Sabin. I want the record to show an exception to the remarks of the district attorney that the defendant

had robbed the old man of $35,000. He has made that statement twice and I want the record to show an exception.

The Court. The district attorney is a quasi-judicial officer. He is supposed to take care of the defendant's rights, as well as the people's rights. He has to argue the case to the jury and explain the reasons why he believes a verdict should or should not be rendered, but he should not give testimony himself and should not make the assertion that the man is guilty or use language of that sort."

It can readily be seen how the prosecuting attorney reached the stated sum of $35,000. The check involved was for $11,270; the loan by Roy Cox in October, $7,000; and the loan by Joseph Cox on October 31st, for $16,800, making a total of $35,070.

The testimony of the People shows the last two named sums to have been loaned to defendant upon his promissory notes, without any misrepresentation whatsoever, and therefor to have been legitimate transactions.

This statement by the assistant district attorney, when considered with the prejudicial testimony and prejudicial statements of the assistant district attorney heretofore set out, and others not herein detailed was reprehensible, and we cannot say that it did not tend to greatly prejudice the defendant in the minds of the jury.

It will be seen that the court did not cause the remarks to be withdrawn from consideration by the jury, nor rebuke the assistant district attorney, which would appear to have been its plain duty.

Time and again this court has cautioned and criticised such inexcusable conduct upon the part of district attorneys, and still they continue to offend every sense of propriety, to disregard their own sworn duty in that respect, as repeatedly defined by this court, and to frequently cause reversals of judgments by reason of such conduct.

It would seem that if a district attorney feels that he

cannot secure the conviction of one charged with crime, upon fairly competent testimony, and without gross denial of the defendant's constitutional right of a fair trial, he should dismiss the case, or resign his office.

It is true that in some cases where the court has believed that no different result was likely because of the clear testimony justifying a conviction, it has been held that the misconduct complained of was not sufficiently prejudicial to justify a reversal. But in this case where the testimony was quite evenly balanced, and where the result must necessarily be largely dependent upon the credit given by the jury to the respective witnesses, the misconduct of the prosecuting attorney was plainly prejudicial.

We feel that it becomes our duty in this case to repeat with emphasis certain expressions of this court, which we regard as entirely applicable here, as follows:

"The most impartial minds and the most honest men find it difficult to decide correctly and fairly the complicated questions of fact that are submitted for their determination in a law suit, without having thrown into the balance that which naturally appeals to passion and prejudice. When such foreign influences are brought to bear upon either trained or untrained minds, it is difficult to tell just what effect they have. Whatever be the merits of his cause, every man is entitled to a fair and impartial trial in courts of justice, according to the established rule of judicial procedure." *Grant v. Varney,* 21 Colo. 337, 40 P. 771.

"The action of the prosecuting officer, as above set forth in the record, constitutes gross misconduct on his part, and a total disregard of the legal rights of the prisoner. It manifests a disposition to ignore the plainest principles of law in relation to the trial of criminal offenses, and exhibits contempt for the authority and dignity of the court, of which he was then an officer. Such statements, coming from the acting district attorney, at the times and in the manner

made, must have been highly prejudicial to the cause of the defendant. They were not only made by an officer of the court, but they were made in the closing or last speech to the jury, when there was no opportunity for defendant's counsel to criticise or answer them. No such facts had been received in evidence, and they were not only wholly outside the evidence, but totally irrelevant to the subject matter of the trial. The officer could have had but one motive in view in the course pursued by him, viz: to prejudice the jury against the prisoner by charging her with the commission of graver crimes than the offense for which she was being tried. Failing to get before the jury such irrelevant testimony, he determined, if possible to poison the minds of the jury against the prisoner by openly charging her upon his own authority, with the murder of the two persons named. In so doing he defied the authority of the court, violated the law, and abused his privilege as a public prosecutor. The law of the land guarantees to every one accused of crime, whether of high or low degree, whether rich or poor, a fair and impartial trial. Certainly it cannot be said, in view of the facts and circumstances above set out, that the defendant in this case received a fair and impartial trial, within the letter and spirit of the constitution and the laws of this state." *Smith v. People*, 8 Colo. 458, 8 Pac. 922.

"This remark was highly improper and ought not to have been made; and while defendant's counsel vigorously protested, the court merely replied that he thought this testimony should not be permitted in a case of this character, and sustained the objection. He should have accompanied this with a strong rebuke to counsel and have cautioned the jury against being influenced by such improper statements and such method of interrogation. Those familiar with jury trials know that such statements made by counsel representing the people are hurtful to a defendant. The trial judge should not content himself merely with rejecting

the offer of such testimony.  He is something more than a mere presiding officer.  It is his duty to maintain the dignity of the court and to protect witnesses and litigants from abuse of counsel, and when, as in this instance, a defendant's legal rights are so flagrantly outraged, the judge should promptly interfere, and by appropriate caution seek to remove from the minds of the jury the unfavorable impression which such conduct must produce."  *Newby v. People,* 28 Colo. 21, 62 Pac. 1037.

"It would be difficult to conceive of a more flagrant injustice to a prisoner than this.  The court should have severely reprimanded the district attorney for this outburst and should have set aside the verdict because such conduct not only must have influenced but as we think in this case, did unduly influence the jury in their finding.  It is the duty of a trial court always to maintain the dignity and uphold the authority of the court, and by reason of its failure to do so in this case, the prisoner upon trial was certainly prejudiced."  *Herren v. People,* 28 Colo. 29, 62 Pac. 835.

The defendant may, or may not, be guilty of the crime charged, and upon that we do not pass, but he was entitled to his constitutional right of fair trial which we are convinced he did not have.

*The judgment is reversed.*

GABBERT, C. J. and GARRIGUES, J., concur.