[Crim. No. 1536. In Bank.—March 14, 1911.]

THE PEOPLE, Respondent, v. WONG LOUNG, Appellant.

CRIMINAL LAW—MISCONDUCT OF JURY—READING PREJUDICIAL NEWS-PAPER ARTICLE OUTSIDE JURY ROOM—AFFIDAVITS OF JURORS INAD-MISSIBLE.—Upon a motion for a new trial for alleged misconduct of the jurors in reading a newspaper article outside of the jury room, which was prejudicial to the defendant, the affidavits of the jurors in respect thereto, were as inadmissible to impeach their verdict, as if the reading had been inside of the jury room.

ID.—MISCONDUCT PROVED BY UNCONTRADICTED AFFIDAVIT OF JUROR'S WIFE.—Prejudicial misconduct, necessitating a new trial, was proved by the uncontradicted affidavit of a juror's wife, that she read such prejudicial newspaper article to her husband, the night before the case was submitted to the jury.

ID.—PRESUMPTION THAT JUROR HEARD READING.—As the husband was a juror, it must be presumed that his hearing was normal, and in the absence of a counter affidavit by him, it must be assumed that he heard the reading of the prejudicial article by his wife.

ID.—PREJUDICIAL NATURE OF ARTICLE—INADMISSIBLE CONTENTS—QUES-TIONS SUGGESTING CONTENTS MISCONDUCT.—The prejudicial nature of the article appears on its face, rendering its contents, if true, wholly inadmissible in evidence, and its contents were such that the mere asking of questions by the district attorney suggesting and insinuating the existence of the facts stated in the article would be misconduct.

ID.—PRESUMPTION OF PREJUDICE FROM MISCONDUCT OF JUROR.—Upon the showing of misconduct by a juror, the law presumes prejudice, and this presumption cannot be overcome by a counter conclusion based upon mere conjecture that the court knew the mental and moral characteristics of the juror.

ID.—CHARGE OF MURDER—ADMISSIBILITY OF DYING STATEMENT—
SPECIFIC OBJECTION NOT URGED.—Where upon the trial of a charge
of murder, dying statements were admissible on their face, they
were properly admitted, in the absence of a specific objection that
they were not made under a sense of impending death.

ID.—IMPROPER EVIDENCE—BAD CONDUCT OF WOUNDED MAN TOWARD
DEFENDANT.—The court improperly admitted evidence that when
defendant was present at a dying statement made at a receiving
hospital by the wounded man, the latter raised himself slightly from
the operating table, and applied a vile epithet to the defendant, and
spat in his face.

ID.—INADMISSIBLE DECLARATION OF DEFENDANT NOT PART OF RES
GESTÆ, NOR ADMISSIONS.—Declarations of the defendant made to
the arresting officers at a distance from the place of the shooting,
in response to statements made by them, as to his identity: "I
haven't done anything. I haven't got any gun," were not admissible
as part of the *res gestæ,* nor as showing admissions of guilt.

ID.—INADMISSIBLE STATEMENTS OF ARRESTING OFFICERS.—A conversa-
tion between the arresting officers at the time of the arrest: "This is
the Chinaman," "This is the man," was not admissible, as evidence
of identity of the man as the deceased's assailant.

ID.—PROPER EVIDENCE OF OFFICERS—RECOGNITION OF DEFENDANT BY
WOUNDED MAN—TURNING AWAY OF DEFENDANT'S HEAD.—The court
properly admitted evidence of the arresting officers that when de-
fendant was brought before the wounded man, he recognized him
as one of his assailants, though he turned his head away, as if
wishing to escape identification.

ID.—EVIDENCE OF OTHER HOMICIDES BY CHINESE TONG—CONNECTION
NOT SHOWN—PROPER EXCLUSION.—The court properly excluded
offered proof to show that a certain Chinese tong was responsible
for other murders committed both before and after the killing of
the deceased, where there is a failure to establish a connection be-
tween such other homicides and the case on trial.

ID.—CROSS-EXAMINATION—QUESTIONS DISALLOWED WITHOUT PREJUDICE.
—The disallowance of questions on cross-examination, one of
which was *prima facie* irrelevant, the purpose of which was not dis-
closed, and another of which related merely to the whereabouts of a
witness during the shooting, is held to have been without prejudice.

ID.—CROSS-EXAMINATION BY DEFENDANT OF HIS WITNESSES DISAL-
LOWED—DISCRETION NOT ABUSED—HOSTILITY NOT PROVED.—It is
held that the refusal of the trial court to allow defendant to cross-
examine his own witnesses, claimed to be hostile, must appear to be
flagrant error, and an abuse of the discretion vested in the trial
court, before this court will interfere with its ruling; and that its
discretion cannot be said to be abused, where there was no sufficient
showing of the hostility of the witnesses.

ID.—CONDITION AND MANNER OF DEFENDANT WHEN ARRESTED—COM-
PETENT EVIDENCE.—The police officers were properly allowed to
testify that when the defendant was arrested, he was puffing, and
was pale, nervous and excited. Such appearances may be described
by ordinary witnesses who have observed them.

ID.—DEFENSE OF ALIBI—EVIDENCE FOR DEFENDANT—REQUESTED IN-
STRUCTION PROPER.—Where there was evidence introduced for the
defendant, which, if true, tended to show that he was not present
at the time of the homicide, a requested instruction as to *alibi* based
on such evidence was proper and should have been given.

ID.—IMPROPER ARGUMENT BY SPECIAL PROSECUTOR—EVIDENCE OUTSIDE
RECORD—MURDER OF INTERPRETER—MISCONDUCT NOT CORRECTED.—
It is held to have been highly prejudicial misconduct for a special
prosecutor to make argument on happenings outside of the evidence,
insinuating that an interpreter had been murdered by an opposing
tong to prevent his appearing as a witness for the prosecution.
Such misconduct should have been promptly corrected by the judge,
and it was error to refuse to correct it when requested by defend-
ant's counsel.

ID.—PROPER INSTRUCTION AS TO DUTY OF JURORS.—The court erroneously
refused to give a proper requested instruction, which is applicable
to all kinds of criminal cases, that jurors are not required to sur-
render their honest convictions for the mere purpose of agreeing
upon a verdict.

APPEAL from a judgment of the Superior Court of Ala-
meda County and from an order denying a new trial. F. B.
Ogden, Judge.

The facts are stated in the opinion of the court.

Stanley Moore, L. G. Carpenter, Fred C. Clift, and W. H.
Orrick, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, for
Respondents.

MELVIN, J.—The defendant was convicted of the crime
of murder in the first degree and was sentenced to death. He
appeals from the judgment of conviction and from the order
of the superior court denying his motion for a new trial. Lee
Chung, a Chinaman, was shot one evening while he was walk-
ing on Harrison Street in the city of Oakland and he died two
days later from the effects of his wounds. Two policemen
(one a regular and the other a special officer) testified that the

shooting was done by three Chinamen and that the defendant was one of them. The policemen said that the defendant after firing the last two shots at Lee Chung ran into an alleyway and that they captured him a few moments later at the other end of the alley from that near which the shooting occurred. When they brought the defendant to the place where the wounded Chinaman lay on the sidewalk, the latter, according to the testimony of the officers, identified defendant as one of his assailants.

The wounded man made two statements. Testimony regarding both of these was admitted in evidence by the court on the ground that the utterances were dying declarations. In both statements the defendant was accused by Lee Chung of being one of his murderers. On defendant's behalf several Chinamen stated upon the witness stand that they saw the shooting; that it was done by two men; and that defendant was not one of the assassins. The defendant and one other witness testified that when the shots were fired they were on Third Street some distance from the scene of the attack on Lee Chung and near the place where the defendant was subsequently arrested. Defendant stated that he stepped into the alley in which he was captured intending to visit a resort on the upper floor of a building there. His companion (who was not captured at the time of the defendant's arrest) on the trial corroborated him in this account of his movements. Defendant also testified that before the dying man accused him of being one of his murderers, Lee Chung was urged by another Chinaman to make the accusation because defendant was a member of the Hop Sing Tong. He also asserted that a similar incident occurred at the receiving hospital before the first "dying statement" was made.

Alleged misconduct of the jury is the first matter presented by appellant as constituting error of sufficient gravity to demand a reversal. A number of affidavits were made by jurors, in which they deposed that they had read a certain article which had been published in the *Oakland Tribune* on the day before the case was given to them for decision. According to this offered evidence some of the jurors had read the article in question outside the jury room and others had perused it after the jury had retired to deliberate. All of these affidavits were, upon respondent's objection, rejected by the court at

the hearing of the motion for a new trial upon the ground that a juror may impeach his own verdict only in those excepted cases specially designated by statute. Appellant concedes that such is the rule with reference to misconduct occurring in the jury room, but insists that it does not apply to occurrences elsewhere. In this behalf his counsel cite the following cases which make the distinction for which they contend: *Hempton* v. *State,* 111 Wis. 127, 86 N. W. 596, 602; *Heffron* v. *Gallupe,* 55 Me. 563; *Rush* v. *St. Paul etc. Co.,* 70 Minn. 5, 72 N. W. 733; *Peppercorn* v. *Black River Falls,* 89 Wis. 38, [46 Am. St. Rep. 818, 61 N. W. 79]; *Harrington* v. *Worcester etc. Co.,* 157 Mass. 579, [32 N. E. 955]. In California, however, no such rule has ever been announced and we cannot see any logical reason for its existence. If considerations of public policy prevent a juror from overturning a verdict by swearing that he or his associates committed some act or acts of misconduct in the jury room, the same reasons should exclude his attempted impeachment of the jury's solemn finding by an affidavit relating to occurrences which may have taken place at his home or elsewhere while the trial was in progress. If a juror reads a newspaper containing some matter prejudicial to a defendant on trial the injury might be and probably would be as great if his violation of his duty took place at home as it would be if the article were perused in the jury room, and we can see no reason why he should be silenced with reference to misconduct committed at one place and permitted to speak regarding the same sort of impropriety indulged in elsewhere. The ruling excluding affidavits of jurors was proper. (*People* v. *Azoff,* 105 Cal. 633, [39 Pac. 59]; *People* v. *Soap,* 127 Cal. 411, [59 Pac. 771].) But in this case there was an affidavit by Mrs. Lily Bartholomew, the wife of one of the jurors, in which she deposed that on the night before the case was submitted to the jury she read aloud to her husband that portion of the article in the *Oakland Tribune* wherein it was stated that defendant was a noted highbinder and had been tried and convicted in San Francisco for murder, sentenced to ninety-nine years' imprisonment, had been granted a new trial upon appeal, but released afterwards because of the burning of the records. This affidavit was admitted in evidence at the hearing of the motion for a new trial and no showing of any sort in opposition to it was

made by the prosecution. At the hearing it was stipulated that the article in question was one reproduced in the affidavit of John F. Conners, managing editor of the *Tribune,* its text being as follows:—

"HIGHBINDER IS BEFORE JURY.'

"Attorney Philip M. Walsh asks for the life of a Noted Chinese.

"Won Loung, a noted highbinder of the Hop Sing Tong is on trial before Judge Ogden and a jury to-day in the superior court on a charge of murder, accused of shooting Lee Chung, a Chinese. The case will probably be concluded late this evening.

"Unusual interest has been manifested in the case by the Chinese residents of this city, on account of the record of the defendant. The latter was convicted before Judge Lawlor of San Francisco for the crime of murder and sentenced to 99 years in prison. The supreme court granted a new trial owing to errors in the instruction of the court to the jury. Before the defendant could be tried a second time the earthquake and big fire occurred, and the records in the case were destroyed, necessitating a release of the defendant.

"Attorney Philip M. Walsh, of the firm of Allen & Walsh, this morning made the opening argument for the prosecution."

That the article above quoted was one calculated to prejudice the mind of a juror against the defendant there cannot be the slightest doubt. It stated in positive terms that he was a noted highbinder; that he had been convicted of murder; and that after the granting of a new trial because of the court's errors in instructing the jury he was released on account of the destruction by fire of the records in the case. These allegations, even if true, could not have been received in evidence at the trial. Indeed the mere asking by the district attorney of questions suggesting and insinuating the existence of such a state of facts as that described in the newspaper article would have been misconduct. (*People* v. *Wells,* 100 Cal. 460, [34 Pac. 1078]; *People* v. *Ryan,* 108 Cal. 585, [41 Pac. 451]; *People* v. *Derwae,* 155 Cal. 595, [102 Pac. 266].) Coming to the juror as they did the statements in the newspaper might have been as prejudicial to the defendant's cause as their suggestion or allegation by the district attorney, depending largely, of course, upon the vividness of the im-

pression produced on the juror's mind, and there was the added disadvantage to the defendant that neither the court nor his own counsel knew of the juror's misconduct in listening to the reading of the damaging article. The law has always jealously protected defendants from the prejudicial influence of matters not properly in evidence in the case on trial. No defendant should be convicted "on general principles" or because he is an undesirable citizen. This rule is so perfectly consonant with every rational man's sense of justice as to be axiomatic, and, therefore, we find that judgments for conviction have been reversed in many cases where evidence of other offenses, alleged to have been committed by defendants on trial, has crept into the records by statements of attorneys, the reading of newspapers by jurors, or supposed information improperly conveyed to them by persons not in court and under oath. In *People* v. *McCoy*, 71 Cal. 397, [12 Pac. 273], Mr. Justice McKee, delivering the opinion of the court said: "There is no doubt, however, that the reading of newspapers by jurors, while engaged in the trial of·a cause, is an inattention to duty which ought to be promptly corrected; and if the newspaper contains any matter in connection with the subject-matter of the trial which would be at all likely to influence jurors in the performance of duty, the act would constitute ground for a motion for a new trial. Jurors in a criminal action are sworn to render a true verdict according to the evidence. They cannot, under the oath which they take, receive impressions from any other source. If it be proved as a fact, or may be presumed as a conclusion of law, that their verdict may have been influenced by information or impressions received from sources outside of the evidence in the case, such a verdict is subject to be set aside on a motion for a new trial. (Pen. Code, sec. 1181, subd. 2.)" In *People* v. *Stokes*, 103 Cal. 196, [42 Am. St. Rep. 102, 37 Pac. 208], this language is used: "It is insisted that a new trial should have been granted, because of misconduct of the jury after they had retired to deliberate upon their verdict. The misconduct charged consisted in the jury reading from a local newspaper an article containing a report of some of the evidence in the case, given at the trial, which included a matter of evidence the court had rejected as inadmissible, and also contained intimations that two of the jurors had been cor-

rupted. The evidence bearing upon the question was given by the officer in charge of the jury. No contrary showing was made by the affidavits of jurors or otherwise. Indeed, conceding that the article was read by them, they could make no showing that would relieve them of the effects of their own misconduct. A juror is not allowed to say: 'I acknowledge the grave misconduct. I received evidence without the presence of the court, but those matters have no influence upon my mind when casting my vote in the jury room.' The law, in its wisdom, does not allow a juror to purge himself in that way.'' (See, also, *Wright* v. *Eastlick,* 125 Cal. 517, [58 Pac. 87]; *People* v. *Chin Non,* 146 Cal. 563, [80 Pac. 681].) It is contended that Mrs. Bartholomew's affidavit is of little value because it does not show what degree of attention her husband paid to her reading. How could it? She says she read the article to him and he alone could have stated how faithfully he listened. As he was serving on a jury it must be presumed that his hearing was normal. (Code Civ. Proc., sec. 198, subd. 2.) If in fact he did not hear, his affidavit to that effect would have been admissible in *support* of the verdict. In the absence of such showing we must assume that he heard the reading of the article by his wife.

The attorney-general contends that the court had the right to consider "the conduct, degree of intelligence and appearance of each juror, including juror Bartholomew, as witnessed by him throughout the trial, in determining whether the irregularity complained of warranted the conclusion that the accused had been prejudiced in his rights, or whether the showing required that the verdict be set aside and a new trial granted," and he insists that the court's conclusion, based upon such considerations, that "no improper influence had affected the verdict" should stand. We know of no rule of law whereby a court is presumed to make such a study of jurors as would enable the judge to say whether or not any particular trier of a case would be influenced by the reading of any article in a newspaper. In the case at bar, six months and twenty days elapsed between the return of the verdict and the argument on motion for a new trial. It would be absurd to presume that the court carried a mental picture of the juror and a close recollection of his demeanor at the trial during all of that time. Upon a showing of misconduct

such as was here demonstrated, the law presumes prejudice and this presumption cannot be overcome by a counter conclusion based upon a mere conjecture that the court knew the mental and moral characteristics of the juror. The presumption of injury from such misconduct is so well established in this state as to need citation of but few authorities.

In *People* v. *Lee Chuck*, 78 Cal. 335, [20 Pac. 726], this language is used: "Section 1181 of the Penal Code, relied on by the respondent, provides (subd. 3) that a new trial may be granted to the defendant 'when the jury has separated without leave of the court, after retiring to deliberate upon their verdict, or been guilty of any misconduct by which a fair and due consideration of the case has been prevented.' It is urged upon us that the section referred to sets forth anᵈ limits the kind of misconduct for which a new trial may be granted, and that to authorize the setting aside of the verdict, it must affirmatively appear that fair and due consideration of the case is prevented. Such a construction of the statute would compel a defendant in every case of this kind, to show affirmatively that he had been actually injured by the misconduct complained of. None of the cases cited go to that extent, and if they did, we should not be inclined to follow them. That the jury in this case was guilty of misconduct, we presume none will deny. The wrongful act committed was one the direct tendency and natural consequence of which was to affect their capacity to perform their duties." In *People* v. *Leary*, 105 Cal. 490, [39 Pac. 24], Mr. Justice Van Fleet speaking for the court said (referring to the reading of newspapers by jurors during the progress of a trial) : "If the matter . . . be such as would from its character, or the manner or connection in which it is stated, be calculated to prejudice or injuriously affect the minds of the jury, a presumption of improper influence arises, and a new trial will be granted, without requiring defendant to show that harm has in fact been done his cause." The same rule is announced in *People* v. *Conkling*, 111 Cal. 628, [44 Pac. 318], where this language is employed: "Jurors cannot be permitted to investigate the case outside the courtroom. They must decide the guilt or the innocence of the defendant upon the evidence introduced at the trial. It is impossible for this court to say that this outside investigation did not affect the result as to the character

of the verdict rendered.  For, when misconduct of jurors is shown, it is presumed to be injurious to defendant, unless the contrary appears.  (*People* v. *Stokes,* 103 Cal. 193, [42 Am. St. Rep. 102, 37 Pac. 207].)"  There is nothing in the cases of *People* v. *Higgins,* 9 Cal. App. 269, [98 Pac. 683], nor *People* v. *Amer,* 8 Cal. App. 137, [96 Pac. 401], cited by appellant, in conflict with the above authorities.  We are confronted with an uncontradicted affidavit showing that one of the jurors received out of court evidence which must have been prejudicial to the prisoner on trial, and we feel compelled, both upon principle and the great weight of authority, to hold that the order denying a new trial must be set aside.

Two purported "dying statements" were made by Lee Chung.  One of these was given at the receiving hospital in Oakland shortly after the shooting and the other at Providence Hospital.  The substance of the first statement was reduced to writing by W. J. Hennessey, Esq., deputy district attorney, and was read to the wounded man who declared that it was correct.  This writing was not introduced in evidence by the prosecution but was used by Mr. Hennessey and Captain Peterson, chief of detectives of the Oakland police department, as a memorandum while they were testifying.  The defendant Wong Loung was present during the taking of this declaration and the prosecution contended that the affirmations of the dying man at the receiving hospital were admissible in evidence not only as his utterances under a sense of impending death, but also as statements made in the presence of defendant.  The declaration of Lee Chung made at Providence Hospital was reduced to writing by Dr. Hamlin and read by him to the patient, who said that it was correct and signed it by his mark.  This document was introduced in evidence.  Dr. Hamlin testified that just before the statement was taken he asked Lee Chung how he felt.  The reply was "very weak."  The physician then asked him if he thought he was going to die and the Chinaman answered that he knew he was going to die.  The written declaration received in evidence begins "I know I am going to die.  I was shot by Wong Loung between ten and eleven P. M. last night, September 13, 1907, near the corner of Third and Harrison streets in Oakland."  Appellant insists that this statement does not satisfy the rule that such utterances may be recorded and

CLIX Cal.—34

afterwards introduced in evidence at the trial of a person accused of murder only when the speaker was under a full sense of impending and almost immediate death; and he also makes the same contention with reference to the previous declaration made at the receiving hospital. In this connection we may say that defendant's counsel failed to make such objection as called this matter to the court's attention. In the absence of specific objection we must hold that the statement on its face is sufficient. (*People* v. *Ybarra*, 17 Cal. 167.) As the case must be tried again, doubtless the district attorney will bring to the notice of the court all the circumstances surrounding the making of the statements by the wounded man. The court admitted evidence of the fact that while making the statement at the receiving hospital Lee Chung raised himself slightly from the operating table, applied a vile name to the defendant and spat in his face. We can see no theory upon which such matter was allowed to go before the jury. If offered to show the defendant's tame submission to insult, a complete answer is that he was in custody and that the affront was offered by a wounded man. What action or comment would have been naturally expected from the defendant? And what inference could be drawn from the circumstances that Wong Loung "wiped his face off and someone removed him to the other corner of the room?" We confess that we can find no suitable answer to these questions. Yet we can see how the detailing of this incident to the jury may have been injurious to the defendant. Jurors may well have concluded that such bitter animosity displayed by the stricken man indicated his certainty of the identity of his assailant. The objection to the evidence should have been sustained. During the examination of Captain Peterson, the district attorney consented that the answer to the question "Why did he shoot you?" be not stated. It appeared, however, in Mr. Hennessey's testimony and was not stricken out, although at a subsequent session of the court the district attorney offered to allow all matters relating to Lee Chung's statement of the reason for the shooting to be eliminated from the record. This offer was rejected by defendant's counsel and in view of their attitude the court permitted the record to remain unchanged. Whether or not counsels' refusal to accept that for which they had previously asked the court would prevent the

defendant from taking advantage of the original error in allowing the evidence to go before the jury need not be discussed here as the case must be tried again and the inadmissible matter will doubtless not be offered.

Certain declarations made after the shooting were admitted upon the ground that they were pronounced in the presence of the defendant. Error is assigned relative to the conversation between the arresting officers when they took Wong Loung into custody. One of them said, "This is the man" or "This is the Chinaman," and the other replied, "Yes, this is him," and the defendant exclaimed, "I haven't anything" or "I haven't done anything. I haven't got any gun." The attorney-general insists that this conversation was a part of the *res gestœ* and properly admitted as such. We cannot agree with that contention. The officers had run some distance from the scene of the crime, turning a corner and proceeding along another street from that upon which the wounded Chinaman fell and had finally apprehended Wong Loung near the end of an alley. What there occurred was no more a part of the *res gestœ* than it would have been if their pursuit had covered a mile rather than a distance of about a block. Nor can we agree with the conclusion that this matter comes under the rule announced in *People* v. *Cole,* 141 Cal. 90, [74 Pac. 547], where a denial of guilt was held under the facts of that case to be a circumstance tending to show the defendant's sense of responsibility for the crime just as flight and concealment of a person charged with an offense are interpreted as having that tendency. In this case the only *conduct* of the defendant attempted to be shown as being exhibited at the time the above quoted statements were made by the officers was his denial of having done anything. No admission of any kind was proven nor was there anything about the denial which converted it into a confession or a statement indicating consciousness of guilt. The remarks of the policeman were not properly admissible. Such evidence is only adduced without error when it is admitted by the defendant to be correct "his acquiescence being indicated by express assent, by his silence or by acts or by conduct on his part which could be fairly construed as assent." (*People* v. *Estrado,* 49 Cal. 173.) This well known rule is also announced and applied in *People* v. *Ah Yute,* 54 Cal. 89; *People* v. *Ah Lee,* 60 Cal. 86; *People* v.

*Morton,* 139 Cal. 722, [73 Pac. 609], and *People* v. *Long,* 7 Cal. App. 31, [93 Pac. 387].)

There was no error in allowing the officers to state what occurred when they brought their prisoner to the place where Lee Chung lay on the sidewalk. They asked him if the defendant was the man who shot him and Wong Loung turned his head away. Nevertheless, he was identified by the wounded man as one of the latter's assailants. Obviously the defendant's conduct under the circumstances was something which might be considered by the jury as indicating a wish on the part of the prisoner to escape identification.

Appellant's next important assignments of error are: 1. That the court erred in excluding evidence tending to show that persons other than defendant killed decedent; 2. That the court erred in excluding evidence tending to show motive in the members of the Bing Gong Tong to commit the crime; and 3. That the court erred in excluding evidence tending to show a consciousness of guilt in members of the Bing Gong Tong. If competent testimony were offered for any one of the purposes mentioned in the above assignments it would have been proper, but in their offers of proof counsel for defendant failed to indicate enough of what they expected to show to enable the court to see the relevancy of the promised evidence. For example, they sought to prove that certain murders had been committed both before and after the killing of Lee Chung, but failed to disclose the logical connection between those homicides and the case which was on trial. The court's rulings excluding the promised proof of these other and distinct crimes were, therefore, free from error. Without going into a detailed discussion of this branch of the case we can say that we find no material error in the rulings which appellant attacks.

Doctor Hamlin was asked about the presence of a certain Chinaman, Louis Doon or Tun, at Providence Hospital when the decedent was there. Objection that this was not proper cross-examination was sustained. Evidently the question was preliminary in its nature, as it did not refer to the time of the taking of the dying statement which was the only period included in Dr. Hamlin's testimony in chief. The purpose of the question being undisclosed the ruling was proper.

Complaint is made that the court unduly extended the cross-

examination of a witness called by defendant. If error was committed, it was not injurious to defendant as the inquiry related to the whereabouts of the witness during the shooting. One of defendant's counsel was denied the opportunity of cross-examining certain of his own witnesses declared by him to be hostile. Flagrant error must appear in such refusal before this court will interfere with the ruling denying one the privilege of cross-examining his own witness. This is a matter largely within the discretion of the trial court and we cannot see that this discretion was abused in the present case. A question to which objection was made was one pointedly insinuating that the witness had not told the truth when he testified that he had not said a word to Lee Chung at the receiving hospital. Other questions sought information upon the matter of the employment of Mr. Walsh, the special prosecutor. Others were inquiries whether or not witnesses belonged to a certain tong. None of the rulings concerning these questions was prejudicial to defendant, but even if all had been, such rulings would have to be upheld as there was no sufficient showing of the hostility of the witnesses whom defendant's counsel desired to cross-examine.

The police officers were allowed to testify over defendant's objection that Wong Loung was puffing and was pale, nervous, and excited when they captured him. It is well settled that such phenomena as paleness, excitement, intoxication and the like may be described by a witness. (*People* v. *Lavelle,* 71 Cal. 352, [12 Pac. 226]; *People* v. *Monteith,* 73 Cal. 8, [14 Pac. 373].) The reason of this rule is well expressed in *State* v. *Baldwin,* 36 Kan. 10, [12 Pac. 323], cited by the attorney-general. There the court used this language: "There is another equally well recognized exception, founded in necessity, under which the opinions of ordinary witnesses are received. Facts which are made up of a great variety of circumstances and a combination of appearances, which, from the infirmity of language, cannot be properly described, may be shown by witnesses who observed them; and where their observation is such as to justify it, they may state the conclusions of their own minds. In this category may be placed matters involving magnitude or quantities, portions of time, space, motion, gravitation, value, and such as relate to the condition or appearance of persons and things. (*City of Parsons* v. *Lindsay,* 26

Kan. 426; *State* v. *Folwell,* 14 Kan. 105.) On the same principle, the emotions or feelings of persons, such as grief, joy, hope, despondency, anger, fear, and excitement, may be likewise shown; and hence the testimony objected to was properly admitted." (Lawson's Expert and Opinion Evidence, rule 64; 2 Best on Evidence, par. 517. See, also, *People* v. *Manoogian,* 141 Cal. 595, [75 Pac. 177].)

Defendant, as we have indicated, previously herein, had introduced evidence which, if true, would show that he was not present at the time of the shooting. His counsel offered an instruction on *alibi* which was refused and nothing on that subject was said to the jury. The attorney-general maintains that the law applicable to the defense of *alibi* was covered by an instruction which was given to the effect that if there was any reasonable doubt as to any one of the facts essential to establish the guilt of defendant, it was the duty of the jury to acquit. The presence of the defendant being one of these essentials, it is argued that the jury would regard proof of his being elsewhere as sufficient to require an acquittal if it should raise a reasonable doubt in their minds regarding the question whether or not he was at the scene of the homicide. As this case must be tried again because of errors heretofore discussed, we need not determine whether or not the court's failure to instruct on this subject of *alibi* is error requiring reversal of a case like the one at bar. Doubtless at the next trial the lower court will save all question on this matter by fully instructing the jury on the law respecting that defense.

The special prosecutor, Mr. Walsh, in his address to the jury said: " . . . Wong Foon, I think, as was established to your satisfaction, was not there that night, and to-day he is a dead man; whether killed by a Hop Sing man or by some other person, it is not necessary at this time to state, but that is the reason why Wong Foon, the interpreter that the defense attempted to place in the hospital on the night of the 13th, in their endeavor to show that Wong Foon was the one who prepared this dying statement, the reason he is not here is because he met with a sudden death." Mr. Moore for the defense promptly interposed an objection and asked the court to instruct the jury to disregard the remarks. The court did not do so. This was error. Not only did this part of the

argument deal with happenings entirely outside the record, but it really amounted to an insinuation that the Hop Sing Tong had procured the murder of a man to prevent his appearance in the case. Such misconduct is highly prejudicial to a defendant on trial for his life or liberty and should always be overcome, when possible, by an instruction by the court.

The court refused to give the instruction frequently asked for in cases of this sort, and, indeed, in all kinds of criminal cases, to the general effect that jurors are not required to surrender their honest convictions for the mere purpose of agreeing upon a verdict. Under the authority of *People* v. *Dole*, 122 Cal. 495, [68 Am. St. Rep. 50, 55 Pac. 581], and *People* v. *Howard*, 143 Cal. 324, [76 Pac. 1116], this instruction should have been given.

From the foregoing it follows that the judgment and order must be reversed and it is so ordered.

Lorigan, J., Shaw, J., Angellotti, J., Sloss, J., and Henshaw, J., concurred.