[Civ. No. 4081.  Second Appellate District, Division One.—February 8, 1923.]

## MELVILLE B. CARLETON, Appellant, v. ANNA BONHAM et al., Respondents.

[1] EVIDENCE—SUSTAINING OF OBJECTION TO TESTIMONY—ABSENCE OF MOTION TO STRIKE OUT—SUBSEQUENT INTRODUCTION WITHOUT OBJECTION—LACK OF PREJUDICE.—Where an objection to testimony is sustained, but no motion to strike out is made, and the matter to which objection is made comes in immediately afterward without objection, no prejudice results from the fact that the objection was sustained in the first instance.

[2] ID.—REFUSAL TO PERMIT FINISHING OF ANSWER—RECORD—LACK OF PREJUDICE.—Prejudicial error cannot be predicated upon the refusal to permit a witness to complete an answer to a question, where no motion to strike out is made and the record fails to show what the witness would have testified to had she been permitted to finish.

[3] DEEDS—ACTION TO SET ASIDE—UNDUE INFLUENCE—EVIDENCE—MENTAL APPEARANCE OF GRANTOR—TESTIMONY OF BANK CLERK.—In an action to set aside certain deeds made by the mother of plaintiff to defendants on the ground of undue influence, a ques-

---

3. Permitting leading questions as matter within discretion of trial court, note, 17 Ann. Cas. 840.

tion asked of the bank clerk with whom the mother generally transacted her banking business as to whether in all her transactions she appeared to be keen mentally and a business woman, while somewhat leading, was within the discretion of the court to permit to be answered, since it called for appearances and not for a state of facts.

[4] ID.—EVIDENCE—PREPARATION OF DEEDS—STATEMENT OF ATTORNEY —PRESENCE OF THIRD PERSON—COMMUNICATION NOT PRIVILEGED. In such action, the statement of the attorney of the grantor that the latter called the witness to her residence and asked him to prepare the deeds was admissible, where it appeared that one of the defendants was present during the conversation, since communications made by a client to an attorney in the presence of third persons are not privileged within the meaning of subdivision 2 of section 1881 of the Code of Civil Proocedure.

[5] ID. — EVIDENCE — RELATIONSHIP AND POSITION OF GRANTEE IN GRANTOR'S HOUSEHOLD.—Testimony in such action as to what work one of the grantee daughters did during the early years of her life while she was living at home with her mother was admissible.

[6] ID. — EVIDENCE — VALUE OF PROPERTY—CONVERSATION BETWEEN MOTHER AND DAUGHTER.—The admission in such action of a conversation between the mother and daughter concerning some furniture and a statement by the latter regarding the value of the amount of her share of the income property in question was not in violation of section 1880 of the Code of Civil Procedure.

[7] ID.—EVIDENCE—DEPOSIT IN JOINT BANKING ACCOUNT OF GRANTOR AND GRANTEE.—Testimony in such action given by a grantee daughter that her husband gave her some checks which were later deposited in the joint banking account of the grantor and such daughter was admissible as having a direct tendency to show the business dealings and relationship existing between the mother and daughter.

[8] EVIDENCE—IMPEACHING QUESTION—FOUNDATION.—Where no proper foundation for an impeaching question has been laid an objection thereto is properly sustained.

[9] DEED—PARENT TO CHILD—PRESUMPTION.—The mere fact that a conveyance is made by a parent to a child does not render the deed presumptively invalid.

[10] ID.—AGE AND ENFEEBLED CONDITION OF GRANTOR—BURDEN OF PROOF.—Where great age and enfeebled condition in the parent, together with such a division of the parent's property among the children as would in itself suggest great partiality, are shown,

---

4. Privileged communications between attorney and client, notes, Ann. Cas. 1913A, 3; Ann. Cas. 1916E, 335.

the burden is upon the attacked donee to show that the gift was made freely and voluntarily and with full knowledge of the facts and a perfect understanding of the effect of the transfer.

[11] ID.—EXECUTION OF DEED—UNDUE INFLUENCE.—Undue influence in the execution of a deed must arise from a confidence reposed by the grantor in the grantee, with the added feeling on the part of the grantor that the grantee has some power or authority over him, and it must appear that such power or authority was used by the grantee on the will of the grantor for the purpose of obtaining an unfair advantage of his weakness of mind or body, or of his necessities or his distress, and that such feeling of power and authority on the part of the grantor was actually present and operating upon his mind with such pressure as to overpower the mind and overcome the volition of the grantor at the very time the deed was executed.

[12] ID.—ACTION TO SET ASIDE DEEDS—ABSENCE OF UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE.—In this action to set aside certain deeds made by the mother of the plaintiff to the defendants, on the ground of undue influence, the findings on all issues against the plaintiff are supported by the evidence.

APPEAL from a judgment of the Superior Court of Imperial County. Franklin J. Cole, Judge. Affirmed.

The facts are stated in the opinion of the court.

James L. Allen and J. W. Hocker for Appellant.

A. C. Verge, O. V. Willson, C. L. Brown and Joseph F. Seymour, Jr., for Respondents.

HOUSER, J.—In this action Melville B. Carleton sued his sister, Anna Bonham, and her husband, Lyman L. Bonham, and his sister's five children and his own daughter Ruth Melrose Carleton, for the purpose of having set aside and canceled certain deeds made in favor of the several defendants by the mother of the plaintiff and his said sister. The plaintiff charges the defendants with having obtained the deeds by means of fraud and undue influence exerted and practiced by them upon the mother at a time when she was sick and incapable of transacting any business. The court found against plaintiff on all the material issues of the complaint and directed judgment in favor of the defendants, from which judgment plaintiff appeals.

It appears that the mother, Lydia E. Hildreth, was a widow of the age of seventy-two years at the time the deeds which are sought to be canceled were executed; that she was an invalid and had suffered greatly for many months prior to her death; that she was possessed of considerable property, located in the city of Brawley, California, worth approximately $25,000, and that she had lived for several years with her daughter, Mrs. Bonham, and her husband and children. Mrs. Hildreth died on the fifteenth day of December, 1920. On October 18, 1919, in consideration of "labor performed" by Lyman L. Bonham, Mrs. Hildreth deeded to him one of the pieces of property which is the subject of one of the attacks by plaintiff herein. On October 30th of the same year Mrs. Hildreth made her will, by which she devised all the other pieces of property, and her devisees under that will were the same as the grantees in the several deeds which are the subject matter of this suit— the only difference between her will and her deeds being that in the will she devised one particular lot, together with its improvements, etc., to the plaintiff and Mrs. Bonham in equal shares, while in the deed she granted that particular lot to the defendant Anna Bonham alone. That piece of property is estimated to be worth $8,500. There is another difference between the will and the deeds, which is that by the will where a particular lot was devised to one of the children of Mrs. Bonham and another lot to another of her children, by the deeds these children exchanged places as to those particular lots. All these deeds were executed on the twenty-ninth day of December, 1919. All the property owned by Mrs. Hildreth was located in Brawley, with the exception of an equity in certain property in Orange County, which equity she deeded to plaintiff. That equity was worth about $640. She also deeded to plaintiff one of the lots in Brawley, the value of which was estimated to be about $1,000. There were eleven different pieces of real property and Mrs. Hildreth made a separate deed for each piece. The income property was granted by these several deeds to Mrs. Bonham and to one or more of her children. Some of the unproductive property was granted to some of the other children of Mrs. Bonham and some of it was granted to Mr. Carleton and to his daughter Ruth Melrose Carleton. The deeds, with the exception of

the one conveying the Orange County property to plaintiff, were all recorded on the thirty-first day of December, 1919; but the plaintiff first learned of the execution and recording of the several deeds to which he takes exception, on January 17, 1920, at a time when his mother was very ill.

In December, 1919, which was perhaps a month or six weeks after the will was drawn, Mrs. Hildreth, who for about two months before that time had been living in a cottage with a colored woman named Mrs. Smith, who was a janitress and who looked after Mrs. Hildreth at night and prepared some of her meals for her, went to live with her daughter, Mrs. Bonham, in one of Mrs. Hildreth's houses in Brawley. Mrs. Hildreth was on friendly terms with the plaintiff, who lived in Los Angeles, and during the last few months of Mrs. Hildreth's life she visited her son in Los Angeles and he visited his mother at Brawley on one or two occasions. Mrs. Hildreth and Mrs. Bonham had joint checking accounts in two different banks at Brawley, and Mrs. Bonham had an individual checking account.

[1] Appellant has specified many particulars by which he contends that the court committed prejudicial error as to his rights. His first specification of error is that the court erred in excluding the testimony of the witness Mamie Smith, as follows:

"Q. How was? Tell the court her condition at that time. A. When I went in she was so bad off she asked me, 'Where is Mel?' Mr. Brown: Now we object to what was said. The Court: Sustained."

Immediately following the order of the court sustaining the objection the following occurred:

"Q. Was Mrs. Bonham present? A. She let me in; she told me to go in. Q. Was she there when her mother asked you where Mel was? A. Yes, sir; and I turned to Mrs. Bonham and said, 'Why don't you write to him and tell him?' Q. What did her mother say about that? A. She asked me to go tell Mel that she wanted him."

It will be noted that, although the objection was sustained, no motion was made to strike out. Furthermore, that the same matter to which objection was made came in immediately afterward without objection; consequently appellant could not have been prejudicially affected by the fact that the objection was sustained in the first instance.

[2]   The second specification of error is that the court erred in excluding the testimony of Mrs. Ida Burger, as follows:

"A. When the little girl came to me, she [Mrs. Hildreth] was wringing her hands and screaming and crying and going on because she was all alone and didn't have any place to die in where she could have peace and comfort. She said, 'Ada, I have done for everyone— Mr. Brown: Object to that. The Court: Any statements she made can't be competent."

From an examination of the transcript it appears that the question which brought out the matter to which counsel refers was put to the witness by one· of the attorneys for defendants and that the objection to the answer was not made by either of the attorneys for plaintiff, but was made by another of the attorneys for defendants. Moreover, there was no motion by any of the attorneys to strike out and the record is silent regarding any effort to show what the witness would have testified to had she been permitted to finish her answer. Certainly, no prejudicial error may be predicated on such a record.

[3]   The third specification of error relates to the overruling of an objection to a question asked by one of the attorneys for defendants of a witness who was a bank clerk in one of the banks where Mrs. Hildreth had her joint checking account with Mrs. Bonham, and with which clerk Mrs. Hildreth generally transacted her banking business—the record showing as follows:

"Q. I'll ask you whether in all her business transactions at the bank she appeared to be keen mentally and a business woman. Mr. Allen: Objected to as incompetent, irrelevant, and immaterial; no foundation laid, and directly leading; calling for a conclusion. The Court: Overruled. A. She did."

Counsel argues that "neither the question nor the answer thereto referred to any period of time, and therefore incompetent, and as to whether or not she was a business woman, is both irrelevant and immaterial. The question clearly calls for a conclusion and is leading."

The transcript of the testimony fairly shows that the time referred to was, at most, not more than a year before the death of Lydia E. Hildreth. While the question was

somewhat leading, it was clearly within the discretion of the court whether or not to permit it to be answered. Besides, the question merely called for appearances—not for a state of facts. That such a question is proper, see *Holland* v. *Zollner*, 102 Cal. 636 [36 Pac. 930, 37 Pac. 231]; *Robinson* v. *Exempt Fire Co.*, 103 Cal. 5 [42 Am. St. Rep. 93, 24 L. R. A. 715, 36 Pac. 955]; *In re Wax*, 106 Cal. 350 [39 Pac. 624]; *People* v. *Manoogian*, 141 Cal. 596 [75 Pac. 177]; *People* v. *Wong Loung*, 159 Cal. 533 [114 Pac. 829].

[4] Specification of error No. 4 has to do with the refusal of the court to grant plaintiff's motion to strike out all the testimony given by witness Wilson, because of the fact that the relation of attorney and client existed between him and Mrs. Hildreth. The particular statement made by the witness, to which objection is made, is as follows:

"Mrs. Hildreth called me to her residence, Mrs. Bonham's place, and she was confined to her bed, and asked me to prepare these deeds."

The reporter's transcript on appeal shows, immediately after the foregoing statement, the following:

"Mr. Hocker (Attorney for Defendants): I move to strike out what Mrs. Hildreth said, if he referred to Mrs. Hildreth telling him to prepare the deeds, for the reason it is incompetent. Move to strike out any conversation or statement made by Mrs. Hildreth with reference to this transaction.

"The Court: I'll grant the motion."

It would therefore appear that as to that particular statement of the witness, and it being the only objectionable one pointed out by appellant, the error, if any, was cured by the court in granting appellant's motion to strike same from the record.

But assuming the rule to be contrary to what actually is the case, that it is the duty of this court to search the record to determine whether testimony other than that specifically referred to by appellant may possibly come within the specification of error, it still appears that counsel's position is untenable, as illustrated in the case entitled *Estate of Nelson*, 132 Cal. 187 [64 Pac. 296], where the court, in discussing a question similar to the one here involved, said: "The proponents afterward called as a witness Mr. Goad, who had drawn the codicil of October 20th, and, against the

objection of the contestants that he was incompetent under section 1881, the court permitted him to testify concerning his interview and conversation with Nelson preparatory to drawing the codicil, and the instructions which he received from Nelson therefor. . . . The communication, as well as the relation between the attorney and his client, ceases to be confidential when it is clearly manifest that it is the intention of the client that the communication should be disclosed, if any occasion therefor should be presented. The consent of the client to such disclosure, which is provided for in section 1881, may be implied as well as express, and by requesting his attorney to draw his will the client impliedly asks him to do and say whatever may at any time and place be requisite for the purpose of establishing the. integrity of the will. Goad had prepared the codicil under the directions of the testator, and by employing him as his attorney for this purpose, the testator had waived the protection of the statute, and released the attorney from the obligation of secrecy as fully as if the attorney had become a subscribing witness to the will. The client thereby makes the attorney the medium through whom the right which he seeks to create may be established." (And see, also, *In re Wax,* 106 Cal. 348 [39 Pac. 624]; *Ruiz* v. *Dow,* 113 Cal. 490 [45 Pac. 867]; *Estate of Dominici,* 151 Cal. 181 [90 Pac. 448].)

In addition thereto, the testimony given by Mr. Wilson shows that at times Mrs. Bonham was present during the conversations, the testimony referred to being as follows:

"Q. Who did you talk with when you went to the residence? A. Mrs. Hildreth. Q. Was anyone present? A. Mrs. Bonham was there. Q. She was there each time you were talking with her? A. I think she was. Q. And there at the time the deeds were signed? A. I don't know she was there at the time they were signed because she wasn't in the room very much as she was in the house."

If the testimony may be construed to the effect that there was a third person present, there was nothing really confidential about the several conversations between Mr. Wilson and Mrs. Hildreth—the rule in such cases, which is so well understood as to require no citation, being that communications made by a client to an attorney in the presence

of third persons are not privileged within the meaning of subdivision 2 of section 1881 of the Code of Civil Procedure.

[5] Specification of error No. 5 deals with an alleged error of the court in permitting Mrs. Bonham, one of the defendants, to testify, over the objection of plaintiff's attorney, as to what work she did during the early years of her life while she was living at home with her mother, the answer being that she lived on a ranch and did nearly all the housework. In view of the fact that undue influence is one of the issues in this case, the relationship and the position of the daughter in the household of her mother was material, relevant, and competent, and it follows that there was no error committed by the court in admitting the testimony to which objection was made.

[6] In specification of error No. 6 appellant asserts that a conversation between Mrs. Bonham and Mrs. Hildreth concerning some furniture, and in specification No. 7 a statement by Mrs. Bonham regarding the value of the amount of her share of the income property concerned herein—all of which was introduced into evidence by defendants and objected to by plaintiff—amounted to prejudicial error because it was in violation of section 1880 of the Code of Civil Procedure; but an examination of that section will show that it has no application to a case of this kind.

[7] By specification of error No. 8 it is claimed the court erred in admitting testimony given by Mrs. Bonham to the effect that her husband gave her some checks which the witness later testified were deposited in the joint bank account of Mrs. Hildreth and Mrs. Bonham. The objection that this testimony was incompetent, irrelevant, and immaterial was not well taken, as it had a direct tendency to show the business dealings and relationship existing between the mother and the daughter, especially as to the joint banking account.

[8] Specification of error No. 9 relates to an alleged error by the court in sustaining an objection to a question calling for a conversation, but at the time the objection was made the proper foundation for the question, which was impeaching in its nature, had not been laid; hence the objection was properly sustained. However, as the proper foundation was immediately laid, the witness was permitted to answer the question without objection.

No evidence was introduced which tended to support the general allegation of fraud, and all the remaining specifications of error refer to findings on the issue of undue influence. It is contended that there is no sufficient evidence to support such findings and that such findings are contrary to the evidence. Contained within the issue of undue influence is the question of the mental capacity of Mrs. Hildreth at the time of the execution of the deeds in question. While there is some testimony in the record to the effect that Mrs. Hildreth was failing in health and was very weak, both before and at the time of the execution of the deeds, and that she was not mentally competent, the evidence, taken as a whole, preponderates the other way—in fact, it is so satisfactory and convincing on that point that it would be extremely difficult to understand how the judge of the trial court could have reached any different conclusion than he did. It would appear that the finding in that regard is unassailable, and if counsels' brief is to be taken as an indication of their views thereon, great reliance is not placed on that contention.

Dealing, then, with the remaining general specification of undue influence, the evidence received by the court, as given by three witnesses, was to the effect that about the 1st of September, 1919, which would be about four months before all the deeds but one were executed, Mrs. Hildreth was nervous, crying, and hysterical; that Mrs. Bonham was also crying, and the mother and daughter were quarreling over some bedroom furniture and a lot or some lots—Mrs. Bonham contending that while Mrs. Hildreth had given the furniture, consisting of a dresser and a commode and a bedstead, to Mrs. Bonham some two years before that time and that Mrs. Bonham had had the use and possession of it during all the intervening period, Mrs. Hildreth at the time they were quarreling had already, in the absence of Mrs. Bonham, taken back the furniture and then wished to make other disposition of it by dividing it between two of Mrs. Bonham's young daughters; and in regard to the lot, Mrs. Bonham was insisting that Mrs. Hildreth deed that lot to Mr. Bonham, as she had theretofore agreed to do, in payment of labor which Mr. Bonham had performed for Mrs. Hildreth. There was also some testimony by one or two of the witnesses, in substance, that Mrs. Bonham had said that

if Mrs. Hildreth would not deed the lot as Mrs. Bonham wished, she would not take care of her mother any longer; also by one witness, that the mother had said to the daughter, "Anna, I don't want to do that; I don't want to wrong Mel; I want to do the right thing by you both; I want to divide that between the two of you"; and that Mrs. Hildreth had also said, "Anna, do you think I am going to deed you all my stuff before I die? I am not going to deed any of the children anything until I get ready." The same witness further testified that Mrs. Bonham told her mother that she had agreed to deed the lot to Mel, and that she had also promised to deed it to Lyman (Mr. Bonham) for the work he had done. Another witness said he had heard Mrs. Bonham threaten to sue Mrs. Hildreth if Mrs. Hildreth did not deed a lot worth about $800 to Bonham.

It appears in evidence that the furniture was later returned to Mrs. Bonham and that the lot was deeded to Mr. Bonham on October 18, 1919, for "labor performed," which would be approximately six weeks after the date of the quarrel between Mrs. Bonham and Mrs. Hildreth, as testified to by the several witnesses.

The only other direct evidence which tended to establish plaintiff's case on the issue of undue influence was certain testimony to the effect that during the last three or four months of Mrs. Hildreth's life the rents were collected by Mrs. Bonham, and that for a considerably longer period Mrs. Hildreth and Mrs. Bonham had joint checking accounts in two different banks at Brawley. Opportunity to exert undue influence was shown by the fact that at the time the deeds were drawn, and for perhaps thirty days prior thereto, Mrs. Hildreth, who was quite ill, was living in the same house with Mrs. Bonham who was caring for Mrs. Hildreth during all that time.

With reference to the quarrel between the two women, Mrs. Bonham denied having made the exact statements which some of the witnesses testified she made, but said that she charged her mother with being an "Indian," that is, that after having made a gift she would take it back, and that her mother cried because Mrs. Bonham had called her an Indian. Mrs. Bonham's testimony shows a long line of devotion to her mother and service in her behalf. She tes-

tified that up to the time she was twenty-four years of age she lived with her parents on a farm; that her mother was ill in bed during a considerable portion of the latter part of that time and that the household duties fell upon Mrs. Bonham. She testified that her mother "would probably get up about 9 o'clock in the morning and get around a little bit, and I farmed out with the men folks. I was kind of delicate and I drove a team and done a lot of work like that outside, . . . and came in at night and helped to get dinner up and supper up and breakfast ready for the men in the morning, and then I would go out and work with a team and with a cultivator and rake. . . . I did the washing of her [Mrs. Hildreth's] bandages and rolled them for her and we generally would have about one a day. I took them and washed them and ironed ∙ them and would roll those up and have them ready for her and she would dress her limb when she would wake up about 9 o'clock.'' Mrs. Bonham married when she was twenty-four years of age, and was away from home for two or three years, when she returned to take care of her father, who had become blind in the meantime, and also to care for her mother, who was ill again. That continued for a little over a year. After the year 1913, and up to the time of her death, Mrs. Hildreth lived with Mrs. Bonham the greater part of the time. In 1916 and continuing for three years thereafter, Mrs. Bonham and Mrs. Hildreth ran a lodging-house in Brawley. That is the property which, by the will, was to be divided between plaintiff and Mrs. Bonham, but which, by one of the deeds made on December 29th, was granted to Mrs. Bonham. The arrangement between Mrs. Hildreth and Mrs. Bonham was, according to Mrs. Bonham's testimony, "I was to have half of everything. I rented the rooms and houses and furnished them out of the rooming-house and my own house to make the money to pay the debts.'' Mrs. Bonham's testimony regarding the terms of her arrangement with her mother in connection with the management of the rooming-house is corroborated by the testimony of the bank clerk who testified that the "exact wording of this account'' was as follows: "Lydia E. Hildreth, in trust for herself and Anna Bonham, joint owners, subject to the check of either, and balance at the death of either to belong to the survivor.'' But Mrs. Bonham never received anything

other than a few dollars for a pair of shoes, etc. The receipts averaged $350 per month, which was all turned over to Mrs. Hildreth and was used by her to pay for the lodging-house and other properties. Mrs. Bonham did all the work, "sweeping, dusting, being night clerk and day clerk, mopping and polishing floors, putting down carpets and taking them up"; general rooming-house work; collecting rents for the rooms and waiting on her mother, who was sick in bed most of the time. Mrs. Bonham also did the washing. Regarding the making of the deeds, Mrs. Bonham testified as follows:

"Q. I'll ask you if you know how the deeds were to be made that were made, or who was going to get the property, prior to the time the deeds were executed? A. No, sir. Q. When Mr. Wilson came there as notary public prior to the execution of the deeds, did you have any knowledge about how she was going to dispose of her property? A. No, sir. She just said she was going to deed them and have it over with; a thousand dollars would be charged anyhow for probating it, and she said she was through with her property. Q. She was going to make deeds and settle it without probate? A. Yes, sir. Q. To save that expense? A. Yes, sir. Q. I'll ask you, then, whether or not, so far as you know, that the deed she made on the 29th of December, 1919, was made in accordance with her will and wish and without any influence or duress or fraud or anything of that kind. A. Yes, sir."

With reference to the joint bank accounts, Mrs. Bonham testified that her husband's wages went into those accounts, and that she rented her own piano for a year and later sold it for a hundred dollars, and those receipts were also turned into the joint bank accounts; that receipts from sales of chickens and eggs which belonged to her personally went into her private bank account.

Mrs. O'Blenes, who for two years, between 1917 and 1919, lived "right across the alley" from Mrs. Bonham and Mrs. Hildreth, never saw either of them crying or heard them having any dispute over the furniture. G. R. Beasley, a son of Mrs. Bonham, never saw any difficulty between them and never heard either his mother or his father try to influence Mrs. Hildreth with reference to the disposition of her property. The testimony of Mr. Wilson, attorney at

law and notary public, who prepared the deeds and took the acknowledgment of Mrs. Hildreth's signature thereto, is significant. Prior to the time the deeds were drawn he had acted as Mrs. Hildreth's attorney in various matters covering a period of several years. In connection with the drawing of the deeds Mr. Wilson said: "The first time I went to see her it seems to me as far as I can remember I was there five or six times. There was some little matters about her rooming-house which she and Mrs. Bonham had rented to some party, I forget the name now, and she asked me about that contract, and then she brought up the matter of making these deeds, and I told her to give me the description of the property and the parties to whom she wanted the deeds made, and I would look the matter up and prepare the deeds and when I got them prepared I would bring them around to her to sign." Mr. Wilson prepared the deeds at Mrs. Hildreth's request and she read them before they were signed. They were made and executed by her in accordance with her express will at that time. He neither saw nor heard any indications of any persons influencing Mrs. Hildreth in the execution or just prior to the execution of the deeds. The matter of giving the direction to draw the deeds, the actual delivery of them and their execution covered a period of about two weeks. The description of the property covered in some of the deeds was not very good and it was necessary to take time to write to Orange County to get the proper description. Mrs. Bonham was nursing Mrs. Hildreth at the time the deeds were signed, and she was in and out of the room. Mrs. Hildreth was in bed the first time that Mr. Wilson saw her in connection with drawing the deeds, which was about two weeks before the deeds were executed, and he saw her in connection with that matter five or six times. When the deeds were finally executed Mrs. Bonham came into the room and propped Mrs. Hildreth up in her bed. She didn't sign the deeds immediately, but read them and then signed them.

[9] Counsel for appellant concede the rule of law in a case of this kind to be that the mere fact that a conveyance is made by a person to his child "does not render the deed presumptively invalid." In 17 Ann. Cas., at page 989, it is said: "The courts have universally held that no pre-

sumption of undue influence in the case of a conveyance *inter vivos* by a parent to a child arises from the mere relationship of the parties, and that, therefore, the burden is upon the party attacking the conveyance to show undue influence." (Citing many cases.) And it has been held that the circumstances of age and enfeebled condition, together with the added fact of an unequal division among the children of the property of the parent, and that the parent resided with the more fortunate child from a pecuniary standpoint—all of which facts fit this case to a nicety—are not sufficient to create a presumption of undue influence. (*Jones* v. *Thomas*, 218 Mo. 508 [117 S. W. 1177].)

[10] But the California cases, notably *Soberanes* v. *Soberanes*, 97 Cal. 140 [31 Pac. 910], *Becker* v. *Schwerdtle*, 6 Cal. App. 462 [92 Pac. 398], and *Nobles* v. *Hutton*, 7 Cal. App. 14 [93 Pac. 289], are to the effect that where great age and enfeebled condition in the parent, together with such a division of the parent's property among the children as would in itself suggest great partiality, are shown, the burden is upon the attacked donee to show that the gift was made freely and voluntarily and with full knowledge of the facts and a perfect understanding of the effect of the transfer.

[11] General influence, however strong, is not undue influence. The opportunity may be present and the grantee may suggest or advise or give good reasons, such as appeal to the affections, or sentiments of gratitude for past services, or even argue with the grantor and thus persuade him to deed his property to him; and in the absence of any showing or any presumption that the importunity was such that it could not be resisted by the grantor, and that the very act of the grantor in executing the deed was the result of force or coercion or something of that· nature, which broke down his will or destroyed his free agency at the time the deed was executed—undue influence cannot be said to exist. Undue influence in the execution of a deed must arise from a confidence reposed by the grantor in the grantee, with the added feeling on the part of the grantor that the grantee has some power or authority over him; and it must appear that such power or authority was used by the grantee on the will of the grantor for the purpose of obtaining an unfair advantage of his weakness of mind or

body, or of his necessities or his distress, and that such feeling of power and authority on the part of the grantor was actually present and operating upon his mind with such pressure as to overpower the mind and overcome the volition of the grantor at the very time the deed was executed.

There is nothing here that indicates with any clearness that Mrs. Hildreth was in the least affected by anything or by any act or conduct emanating from the daughter. True, she returned the furniture to her daughter, but the furniture already belonged to her. True, she made a deed to Mr. Bonham of the lot regarding which the two women had their quarrel, but the evidence showed that she owed it to him for "labor performed" and that she was simply paying her debt in the manner in which she had theretofore agreed to pay it. The furniture was returned shortly after the quarrel, and the deed to Mr. Bonham was made within six weeks thereafter. The will was executed within two months, while all the other deeds were not executed until after the expiration of four months from the date of the quarrel. If the execution of these deeds was brought about through the exercise of undue influence, it would seem reasonable and probable that they should all have been executed at the time the deed was made to Mr. Bonham, or, failing in that, that the will, which was practically identical with the deeds as far as plaintiff is concerned, with the exception of this particular piece of property, should have disposed of the matter completely at that time, subjugating the will of Mrs. Hildreth to that of Mrs. Bonham and to the entire satisfaction of Mrs. Bonham.

[12] In this case, while the opportunity for the exercise of undue influence undoubtedly existed, and while the law of this state appears to be that in circumstances such as the evidence shows were here present, the burden is cast upon the grantee to show that the gift was made freely and voluntarily and with perfect understanding of the effect of the transfer, the findings of the court based upon the testimony of many apparently credible witnesses preclude any conclusion other than that at all times, including the act of the execution of the deeds, the grantor was acting with the utmost freedom, of her own volition and with the greatest clarity of her mental perceptions, which, according to all the witnesses, was far above the average of ordinary

attainment. If the evidence can be said to show any one thing clearly in this case, it is that at no time before the execution of the deeds was Mrs. Hildreth's mind in anywise affected. Her body was weak and she was suffering from the effects of disease, but her mind retained its full vigor. Her act in giving the bulk of her property to her daughter, rather than to her son, was most natural. The evidence shows years of continuous devotion, solicitude, and kindly care by the daughter for her mother, to say nothing of the labor, sacrifice, and hardship expended and suffered by the daughter on the mother's account. The mother's gift to the daughter was but a recognition, and in no sense a full compensation, for the daughter's service to her. On the other hand, while friendly relations existed between the mother and the son, nothing appears in the record to show that any particular interest or attention was ever shown by the son in his mother's welfare. Perhaps he was unable, either from his nature or from his financial condition, to respond in great volume to his mother's necessities. The deeds to him of a portion of his mother's property amply cover any pecuniary or parental obligation arising out of the conditions as shown by the record herein.

The findings of the court on all issues of fact were against plaintiff's contentions. A careful review of the evidence contained within the reporter's transcript on file in this appeal convinces this court that such findings are supported by a preponderance of the evidence and are therefore legally unassailable. As to some of the issues the evidence is overwhelmingly in favor of the findings, and as to each and all of the others there is at least a substantial conflict in the evidence upon which each of them is based. California cases so numerous as to require no citation and for reasons so thoroughly understood as to require no elucidation are practically unanimous in holding that in such circumstances the findings are conclusive.

The judgment is affirmed.

Conrey, P. J., and James, J., concurred.