## GRANT ET AL. v. VARNEY.

21   329
23   172
23   367
9a   391

21   329
29   405
16a   64

21   329
d32   165
32   301
18a   292

21   329
33   321
f19a   208

21   329
20a   201

21   329
f37   164

1. INSTRUCTIONS.

The giving of an instruction embodying a correct legal principle does not cure the error committed in giving another containing a contrary statement upon the same proposition.

2. EVIDENCE—EXPERTS.

Experienced miners are competent to testify in relation to matters of skill in their department of labor that requires special training, and to which only those skilled in such work could give intelligent answers.

3. EVIDENCE.

In an action against a mine owner for the death of an employé caused by the falling of a roof of a drift, evidence that the defendant had issued general rules and instructions to its workmen that the men who were engaged in working in the drift should do the timbering whenever they considered it necessary and essential to their safety is admissible on behalf of the defendant; but if it is established only that such instructions had been given to individual workmen, or that no knowledge of such instructions to individual employés had ever been brought home to the deceased, it is inadmissible.

4. MASTER AND SERVANT.

It is the duty of the master to furnish and maintain a reasonably safe place for the servant to work in. If he delegates to an agent the performance of this duty, who is negligent in furnishing or maintaining such a safe place, and if, in working therein, and without fault of his own, an injury occurs to another employé, such negligence is the negligence of the master.

5. PRACTICE—COUNSEL'S ARGUMENT.

Counsel in their argument to the jury should be required to keep within
the record and not be permitted to supply the defects of proof by
drafts upon the imagination.

*Appeal from the District Court of Pitkin County.*

THE plaintiff below, who is appellee here, instituted this
action, as the widow and sole heir at law of Joseph N. Var-
ney, deceased, to recover damages for the death of her hus-
band, alleged to have been caused by the negligence of the
defendants.

The complaint charges that said Varney was a miner em-
ployed by the defendants to work in the St. Joe mine, and
that whilst he was so engaged in his employment, in running
a drift therein, the roof thereof caved in and fell upon and
instantly killed him.    The caving and falling in of the roof
were in consequence of the wrongful and negligent failure
of the defendants properly to timber said drift, or cause the
same to be timbered.

The answer denies the negligence of the defendants, and
contains three separate and distinct defenses, the *first* of
which sets up the contributory negligence of Varney as the
proximate cause of the injury; *second*, that if the death of
said Varney was caused by the negligence of any one other
than that of himself, it was the result of the negligence of a
fellow servant; *third*, that said deceased had equal means of
knowledge with the defendants of the alleged unsafeness of
defendants' mine, and thereafter continued in the service.

Trial was had upon the issues thus joined, and a verdict
and judgment for $5,000 was rendered against the defendants,
from which judgment the defendants come here by appeal.
The evidence of plaintiff tended to show that on the night
when Varney was killed he and his companion, Steel, were
engaged in running a drift in the mine in ground which,
though breaking well, required blasting.    These two men
were doing the work of drilling and blasting.    The defend-
ants had employed a man named Moore to timber the drift

so as to provide and keep a safe place in which Varney was to carry on his work. For a day or two previous Moore had absented himself from the mine, and been in Aspen, occupying himself with politics in the town, instead of confining his attention to the work for which he was employed at the mine. In consequence of this inattention by Moore to his duty, and possibly from an insufficient force of men expeditiously to do the work, the protection of the drift was neglected, so that at the time of the accident the last of the timbering was at a distance of from sixteen to eighteen feet from the breast of the drift where the men were engaged in pushing forward the work of extension. While so prosecuting their work, with the roof of the drift back of them without any support for a space of about seventeen feet, the roof suddenly caved in, and a huge boulder fell upon and instantly killed both Varney and Steel. None but these two men were in the mine when the accident occurred, and it is from witnesses who were employed in and about the mine, and who found these unfortunate men soon after their death, that the evidence for the plaintiff was elicited. Testimony was also brought out, both in the cross-examination of plaintiff's witnesses and in the direct evidence of defendants,' tending to show that Varney knew, equally with defendants, of the danger that would probably result from working in a place where the timbering was so far behind the breast of the drift, and that he had, only a short time before he lost his life, been warned by one of the witnesses that there was danger in remaining in the drift, and that he (Varney) replied that, although there was danger, yet, by keeping close to the breast of the drift, he thought he might safely keep on with his work. There was evidence that before this Varney had complained to a fellow servant of his in the mine that the timbering was not keeping pace with the work of extension, and requested that complaint thereof should be made to Bush, the superintendent of the mine, which was done, with the result that no additional steps were taken to make the place safe, and no promise was made to do so. Bush is

reported to have said that he wanted to push the running of the drift as rapidly as possible, so as to make for his employers that month as good a showing as possible, and thought that there was no necessity to hasten the timbering. In spite of this remonstrance and reply, Varney continued his work in this dangerous place. Evidence was also introduced tending to show, by experienced miners, that good mining required that a drift made in such ground and under such circumstances as this should be kept timbered all the time up to within three or four feet, or the length of one set of timbers, of the breast of the drift. The evidence of the defendants had for its object to establish affirmatively that defendants were not negligent; that Varney knew, equally with the defendants, of the unsafeness of the place where he was working, and thereby was guilty of contributory negligence which would defeat a recovery by the plaintiff; that the injury was caused, if by anything other than the negligence of Varney himself, by the negligence of Moore, who was a fellow servant of his. There was also evidence to the effect that defendants had used reasonable care in providing a proper place for Varney to work, and an attempt is claimed to have been made by the defendants to show that they had issued general rules and provided instructions for the miners to do for themselves the work of timbering the drift whenever, in their judgment, their own safety demanded it, but that Varney disregarded the rules thus prescribed, and, by violating them, brought upon himself his own destruction. From this summary of the evidence it will be observed that plaintiff's cause of action, and all the defenses interposed by the defendants, unless it be that of the negligence of a fellow servant, have some evidence which the parties had the right to have the court submit to the jury by appropriate instructions.

Messrs. THOMAS, BRYANT & LEE and Mr. C. H. PIERCE, for appellant.

Mr. J. W. TAYLOR, for appellee.

MR. JUSTICE CAMPBELL delivered the opinion of the court.

The first instruction given by the court of its own motion is as follows :

" If the jury believe from the evidence in this case that the defendant, E. W. Bush, was superintendent of the defendants, and had full charge and control of the property and of the men employed therein, then it was his duty to see that the drift in which deceased was at work was properly and securely timbered, and his failure to do so would be negligence, and his negligence would be the negligence of the other defendants whom he represented, and he could not delegate this duty to an employé and shift the responsibility for negligence in not properly timbering such drift on to such employé, so that the defendants could claim that the injury occurred by reason of the negligence of a coemployé. *The duty to furnish a safe place for said Varney to work in was the duty of the defendants. If they failed in that, they were guilty of negligence.*"

The defendants assign for error the giving of the foregoing instruction, especially the portion which we have italicized. This instruction is not the law. It virtually declares that the duty of the master is to furnish to the servant an absolutely safe place in which to work. In other words, it makes the former an insurer of the safety of the latter. The failure to provide a safe place for the employé to work in is not negligence of his employer, but the jury were, by this instruction, told that it was. The contention of counsel for appellee that the vice in this instruction is not fatal to the judgment, because in other and subsequent instructions the jury are practically told that the employer's duty requires that he should furnish a reasonably or ordinarily safe place for his employé to work in, is plausible, rather than sound. True it is that where the court gives an instruction which contains only a partial, though, so far as it

goes, correct, legal proposition, and in another instruction completes and perfects the statement of the correct rule, prejudicial error may not be assigned. But where, in the same charge to the jury, are found one instruction embodying a correct legal principle, and another instruction containing a contradictory statement upon the same proposition, which is not the law, there is error. For this court to attempt to speculate or determine which instruction the jury in such a case selected as stating the correct rule, and which they rejected as incorrect, would lead us upon an uncertain voyage, and would be to credit the jury with powers of legal discrimination superior to those possessed by the court which submitted for their guidance rules so essentially antagonistic. To say that a rule which makes a master the insurer of the safety of his servant is, in effect, the same rule which requires that he shall provide only a reasonably safe place for the latter to work in, would be to abolish all rational and recognized legal distinctions. *Wells v. Coe,* 9 Colo. 166; *Clare v. The People,* 9 Colo. 122, and cases cited; *Holman v. Boston Land & Security Co.,* 20 Colo. 7.

2. This ruling upon the foregoing assignment of error necessitates a reversal of this case, and renders unnecessary a determination of the numerous other errors discussed. In view, however, of the contingency of another trial, and to save possible error in the court below, we feel constrained to add some suggestions that may be of some assistance to the court and counsel. In a case involving issues such as are raised by the pleadings and evidence in this case, it would seem that so many of the questions, fully discussed by counsel in their briefs, have been settled by repeated decisions of this court that an examination of these cases ought certainly to furnish a satisfactory and safe guide to court and counsel in drawing instructions.

(a) Witnesses for the plaintiff were permitted, over defendants' objection, to state, in substance, what was the proper method of timbering a drift run in such ground as the evidence shows this one penetrated. Counsel for defendants

now say that such questions permitted the witnesses to state what the jury were, as a matter of fact, to find from the evidence, and that the opinions of the witnesses were not admissible. The witnesses were not allowed to state whether or not this drift, with the timbers fifteen or sixteen feet from the breast, was safe. They spoke only as to the proper way to timber it. We think there was no error in this. These witnesses qualified as experienced miners. The questions related to matters of skill in a department of labor that requires special training, and to which only those skilled in such work were competent to give intelligent answers. The fact, if it be a fact, that the court did not explain to the jury this class of evidence, and throw about it the proper safeguards, does not go to the admissibility of the evidence, but only to the alleged error of the court in other particulars.

(b) The court below struck out certain evidence given by one of the witnesses for the defendants, and refused to admit other evidence offered by the defendants, tending to show that defendants had issued general rules and instructions to its workmen, which provided, in substance, that the workmen who were engaged in running the drift should do timbering whenever they considered it necessary and essential for their safety. Such evidence was, of course, pertinent, and an offer to prove such rules by competent testimony should have been allowed. An examination of the record shows that such attempt was only to establish that such instructions had been given to individual workmen, and no offer was made to show that any general rules or instructions had been issued by defendants or their superintendent, or that knowledge of such directions to individual employés had ever been brought home to the deceased. In this ruling by the court there was no error.

(c) In instructions Nos. eleven, thirteen and fourteen, as asked by the defendants, the court stated to the jury a hypothetical case, based upon the evidence, which, if the jury found to be true, they were told, would prevent a recovery by the plaintiff. The assumed case was one that was intended

to constitute contributory negligence on the part of Varney.
To each one of these instructions the court added a proviso
which, in its logical effect, must have conveyed to the minds
of the jury—if it conveyed any intelligent meaning—that not-
withstanding they might, in accordance with the first part of
the instructions, or the instructions as asked, find that Var-
ney was guilty of contributory negligence, yet they must not
find for the defendants unless they also believed from the evi-
dence that Varney was not exercising reasonable care and
prudence.    It is unnecessary to determine whether or not
these instructions, as asked by the defendants, were the law.
It is sufficient to say that, as modified and given, they must
have confused and misled the jury, as they would almost any
legal mind.    It is true that if a master is guilty of negligence
which was the proximate cause of the injury complained of,
and there is nothing else in the case that calls for the appli-
cation of some recognized exception to the general rule, the
servant may recover, if he was at the time using reasonable
care.    If the proviso added to these instructions merely states
this general rule, and if the instruction as asked stated a
contradictory rule, the former should have been given by
itself, and the latter refused altogether.    If, however, the
instructions as asked did state what in law constitutes a
case of contributory negligence, they should have been given.
But if it be contended that both these instructions and the
provisos are but different forms of the same legal proposition,
still it was confusing to the minds of the jury thus to com-
bine them; for the adding of the provisos would naturally
lead the jury to conclude that the instructions as asked were
themselves incorrect, and that the court thereby intended the
jury to understand that the provisos added by the court were
necessary to make the instructions good.    If, on the other
hand, the instructions and provisos constitute inconsistent
propositions of law, then in one instruction we have two in-
correct and contradictory rules, and such combination, of
course, would be prejudicial error.

   (d) We think that Moore was not a fellow servant of

Varney. The duty of the master is to furnish and maintain a reasonably safe place for the servant to work in. If the master delegates to an agent the performance of this duty, the latter is considered as the representative of the former; and if such agent is negligent in furnishing or maintaining such a safe place, and if, in working therein, and without his fault, an injury occurs to another employe, such negligence is the negligence of the master, for which the injured workman may recover. It is the same as where the master is bound to furnish for his workmen reasonably safe and proper machinery, and employs an agent to purchase it, or where he employs a servant to maintain the same in good repair. If such agent is negligent, and selects unsuitable or unsafe machinery, or the servant neglects to keep in good repair said machinery, in using which another servant receives an injury without any fault on his part, the negligence of the agent who bought the machinery, or of the servant whose duty it is to keep the same reasonably safe, is the negligence of the master, for which an action will lie.

(e) If this case is to be tried again, we think there will not be a repetition of the unusual scene that marked the close of the first trial. In his closing argument to the jury, counsel for plaintiff, actuated, doubtless, by zeal for his client, and possibly carried away by the exuberance of a heated imagination, went outside of the record, and, at the close of a scathing arraignment of defendants, referred to them as "living in their mansions, and handling their millions." The record is silent as to any evidence upon the kind of houses in which defendants live, or the extent of their wealth. Objections were promptly made by counsel for defendants, and plaintiff's counsel withdrew the reference, and asked the jury to strike it from their minds, in which request the court, somewhat mildly, joined with counsel, and told the jury entirely to disregard the statement because it was improper, and inferentially referred to the counsel for plaintiff by remarking that "such statements should not be made in court to the jury in the argument of this case." Thereupon

plaintiff's counsel proceeded with his argument, employing language set out in full in the bill of exceptions,—exceedingly forceful, eloquent and picturesque. At the close of his peroration, as we are advised by the affidavit of one of defendants' counsel, " the audience broke out into prolonged, loud and continuous applause, thereby manifesting their approval of the statements of counsel for the plaintiff." The court said to the audience, " Gentlemen, that is entirely improper to have any such demonstrations in the court room; " and again the court cautioned the jury against allowing such things as these to influence their verdict.

This rather extraordinary and dramatic closing of a trial in a court of justice calls for a few words from us. Great latitude should be allowed counsel in addressing a jury, so that he may fully and fairly present every point in his case; but he should be kept within the limits of the evidence, and not be permitted in his argument to testify, without having been sworn as a witness, or to interject into the case evidence that was never elicited at the trial.

In *Brown v. Swineford*, 44 Wis. 282,—which decision fully comports with our ideas of professional ethics,—the forcible remarks of Chief Justice Ryan we adopt as our own. The case was an action of tort, calling for exemplary damages, and evidence of the financial ability to pay was admissible, under the decisions of that court. There was no evidence at all upon this point. Defendant, however, was connected with a railroad corporation. In argument to the jury counsel for the plaintiff endeavored to supply the defect in his proof as to the defendant's pecuniary ability to respond to a verdict by drawing for his facts upon his unaided imagination, and attributing to the defendant the possession not only of great wealth, but ascribing to him the possession of earthly goods in amount equal to that belonging to the corporation of which defendant himself was only a subordinate officer. For this the supreme court reversed the judgment of the lower court. In that case, as in this, the practice condemned arose in the case of an eminent member of the bar, whose professional

reputation is well known, and " whose professional ability needs no adventitious aid, and who probably fell into this error casually and inadvertently. His professional standing shields him from personal censure, while it will give emphasis to the rule laid down."

The applause of the audience probably could not have been anticipated, and for such a demonstration no one connected with this case can be held responsible. In our judgment, the court should have more pointedly rebuked counsel for his violation of professional conduct, and more clearly impressed upon the jury that they should not be influenced thereby. A spontaneous outburst of applause by the audience ought not to have been passed over as only a trivial offense, but they should have been punished in some proper way, or at least severely censured, for their reprehensible interference with the course of justice, and for their evident attempt to influence or coerce the return of a verdict for plaintiff.

The jury returned with their verdict a statement that neither the transgression of counsel nor the applause of the audience influenced them in their deliberation. Possibly not. Possibly the verdict would have been the same had there been no audience present, and had counsel altogether waived his closing argument; but that, without any suggestion or request, so far as the record shows, the jury should have made such an unsolicited and voluntary finding awakens in our minds a fleeting suspicion that their better judgment must have told them that such conduct sometimes, with some other juries, might possibly produce such a result. The question is not, necessarily or primarily, what effect did such things as happened at the close of this trial have in this particular case, but what tendency do they and would they naturally and probably have with juries in general, in arriving at their verdicts?

The most impartial minds and the most honest men find it difficult to decide correctly and fairly the complicated questions of fact that are submitted for their determination

in a lawsuit, without having thrown into the balance that which naturally appeals to passion and prejudice. When such foreign influences are brought to bear upon either trained or untrained minds, it is difficult to tell just what effect they have. Whatever be the merits of his cause, every man is entitled to a fair and impartial trial in courts of justice, according to the established rule of judicial procedure. In this state he is not required to submit the issue of his life and his property rights to a verdict of a town meeting, or to an organized band of people who throng the court room to impress or coerce by their presence the jury which has been organized by law to try his cause.

The foregoing considerations require that the judgment should be reversed and remanded.

*Reversed.*