5 So.2d 355

STATE v. SNOWDEN.

No. 36351.

Dec. 1, 1941.

Rehearing Denied Dec. 22, 1941.

Eugene Stanley, Atty. Gen., Niels F. Hertz, Asst. Atty. Gen., and James U. Galloway, Dist. Atty., and Edwin L. Blewer, Asst. Dist. Atty., both of Shreveport, for the State, plaintiff and appellee.

Wellborn Jack, of Shreveport, for defendant and appellant.

ODOM, Justice.

On February 4, 1941, the district attorney filed a bill of information against the defendant, charging that he "did shoot Mrs. James Ira Snowden with a dangerous weapon, to-wit: a pistol, with intent to commit murder". Mrs. James Ira Snowden was the wife of the defendant.

The defendant was brought into court on February 7, 1941, accompanied by his counsel, who filed a "Plea of present insanity and plea of insanity at the time of the alleged commission of the crime". On February 14, the accused was again brought into court, accompanied by his counsel, and the plea of insanity previously filed was submitted to the court on affidavits filed; whereupon the court appointed Doctors D. L. Kerlin and D. H. Duncan, experts in mental diseases, to examine the defendant with regard to his mental condition, and directed them to make their report in writing to the court within 30 days.

On March 19, the experts appointed by the court filed their reports in open court. They reported that they found defendant to be sane at the time the crime was alleged to have been committed and sane at the time the report was made. The court on April 5, after considering the reports made by the psychiatrists and the affidavits filed, found defendant to be sane and denied his plea.

Defendant was arraigned on May 16, and entered a plea of not guilty and pleaded insanity at the time the crime was alleged to have been committed, and the case was fixed for trial for May 28, on which date a jury of five was empaneled and sworn. The plea of insanity was submitted to the jury.

The defendant was convicted of shooting with intent to kill and sentenced to hard

labor in the state penitentiary for one year. From the conviction and sentence defendant appealed.

The errors on which defendant relies for reversal of the conviction and sentence are set forth in three bills of exception, two of which relate to the same issue and will be discussed and disposed of under the same heading.

The first bill on which defendant relies was reserved to the refusal of the trial judge to order a mistrial and a discharge of the jury. The facts relating to this alleged error are substantially as follows:

The jury was empaneled and sworn on May 28, 1941, and the trial was begun by the calling and examining of one witness. The case proceeded until the hour of adjournment, when the jury was discharged for the day and the jurors were permitted to separate under proper instructions by the court.

The Shreveport Journal, an afternoon paper published in the City of Shreveport where the trial was being conducted, in its issue circulated on the afternoon of the day on which the trial was begun, carried a lengthy news article about the case, under the following bold headlines:

"Razor Found on Snowden
"When He Arrives in Court"

Among other things, the following recital was contained in the news article:

"Just before court opened, with Judge Robert J. O'Neal presiding, Deputy Sheriff Ed Ward came into the courtroom and informed Deputy R. E. L. Huckabay, court attendant, that a report had reached the sheriff's office that Snowden has a pistol in his pocket.

"Deputy Huckabay motioned Snowden into an anteroom, and with Deputy Ward searched him.

"They found no pistol, but did find an old-type straight razor in a case in his pocket. The case had a rubber band about it.

"Snowden, the officers said, told them that he had brought the razor for Wellborn Jack, his attorney, as evidence in the case. The razor was taken in charge by the officers, and few persons in the courtroom were aware of the incident."

The Shreveport Times, a morning newspaper published and extensively circulated in the City of Shreveport, carried a lengthy article about the case in its edition published in the early morning of the day after the trial was begun, under the following bold headlines:

"Witness Describes How
"Snowden Wounded Wife"

The article recited at length the facts relating to the shooting of Mrs. Snowden by the defendant, her husband, as detailed by the witness Mrs. W. J. King, who was called by the State and who had given her testimony on the previous day, the first day of the trial. The last paragraph of this article reads as follows:

"Snowden was searched on his appearance in court yesterday after Deputy Sheriff Ed Ward said he had been informed the defendant was carrying a pistol. When searched by Deputy Ward and Court Deputy R. E. L. Huckaby, Snowden

was found to have in his pocket a straight razor in a case. He said that he had brought the razor to court for his attorney to use as evidence in the trial."

On the morning of May 29, the second day of the trial, and after both newspapers had been distributed throughout the city, the jurors came into court at the hour set for the resumption of the trial. Thereupon counsel for defendant requested that the court order a mistrial and that the jury be discharged, on the ground that the newspaper articles were highly prejudicial to the interest of the accused. The trial judge refused the request of counsel on the ground that it had not been shown that the members of the jury had read the articles. Counsel for defendant then requested the judge to ascertain from the jurors whether they had read the articles. The judge asked them whether they had read the article in the Shreveport Journal, and one of them said that he had. Each of the other four said he had not. They were then asked by the judge whether they had read the article in the Shreveport Times. One of them said that he had, and each of the others that he had not.

Counsel for defendant, then present in court, asked no questions. There is nothing to show that the juror who read the article in the Shreveport Journal had mentioned that article to the other four, nor is there anything to show that the juror who read the article in the Shreveport Times had mentioned that article to the others. Counsel for defendant suggests that the presumption is that the two jurors who had read the articles had related to the others the substance of what they had read. Assuming, however, that they had, the fact is that no attempt whatever was made by counsel for defendant to show that the articles in the newspapers had influenced the jurors in the slightest degree. The judge in questioning the jurors did not refer to that point, and counsel for defendant did not request him to question them as to what impression, if any, they received from the newspaper articles or whether they were influenced by them. Counsel for defendant has argued orally and in brief that the articles were prejudicial per se, and that it must be assumed that the jurors were prejudiced thereby.

If it be conceded, as counsel argues, that the articles are prejudicial in their nature, the fact is that counsel for defendant neither showed, nor attempted to show, that the jurors who read them paid any attention to them or that the reading of them influenced the jurors in the slightest degree in reaching a verdict. Counsel for defendant made no attempt to show injury. We cannot assume injury when none is shown. On the contrary, under the facts shown, we must assume that defendant was not injured.

The court had not previously instructed the jurors not to read articles in the newspapers relating to the trial. But, before proceeding further with the trial, the judge said to them, "The Court now instructs you not to read any articles in the newspapers with reference to the trial of this case." The court then said to the jurors:

"The Court further states that the articles, were in error, as published in the newspapers, and the facts stated therein, are not true, and if you read any articles, not to give any credence to the statements contained in the papers, because they have no bearing on the case."

The court not only instructed the jurors to pay no attention to what they had read, if they had read the articles, and to disregard them entirely, but told them that, as a matter of fact, the statements made in the articles were not true.

The falsity of the news articles referred to by the judge related to the statement in the newspapers that defendant had appeared in court with a straight razor in his pocket, whereas the testimony adduced at the trial showed that defendant did, on that morning, have in his pocket a knife, which he had, according to his testimony, brought to his counsel to be exhibited in evidence. The two deputy sheriffs testified that, whereas it had been reported to one of them that defendant had come to court armed with a pistol, yet, when they searched him, they found not a pistol, but a knife, in his pocket, which knife, defendant told them, he had brought to give to his attorney so that it might be filed in evidence as an exhibit.

The judge in his per curiam says in connection with his interrogation of the jurors that:

" * * * whereupon the Court stated to the jurors that the article was erroneous in point of fact, and that they should disregard it, and try the case on the evidence

adduced at the trial. Counsel did not question the jurors.

"There was nothing to show that the article in any way influenced the jury and no prejudice being shown the defendant was not entitled to a mistrial."

Further on in his per curiam the judge states:

"The verdict, in my opinion, should have been guilty as charged. I am satisfied that the articles in the newspaper did not influence the jury to find the verdict of guilty."

The ruling of the court was correct. We must assume that, if the reading of the newspaper articles had any prejudicial effect, such effect was removed by the special instruction which the court gave to the jury. In order to justify this court in reversing a conviction under such circumstances as are disclosed in this case, injury and prejudice must be shown. Marr's Criminal Jurisprudence, under the general heading "Injury Must Be Shown"; State v. Hoffman, 120 La. 949, 45 So. 951; State v. Alvarez, 182 La. 908, 162 So. 725; State v. Green, 185 La. 175, 168 So. 766; State v. Taylor, 192 La. 653, 188 So. 731; State v. McClain, 194 La. 605, 194 So. 563.

The other two bills of exception relate to the same point. As we have already stated, the court appointed a lunacy commission to examine the defendant and make report concerning his plea of insanity. The commission made its report in writing after hearing the testimony of several witnesses, which testimony was by

the commission reduced to writing and attached to the report.

The defendant at the trial of the case called as a witness a psychiatrist who was not a member of the commission. This expert was of the opinion that the defendant was insane both at the time of the commission of the crime and at the time of the trial. While he was being interrogated as a witness, he was handed the report of the lunacy commission and asked whether he had taken that report into consideration in reaching his conclusion that defendant was insane. He stated that he had. Counsel for defendant then requested that the report, together with the testimony on which the commission based its conclusion that defendant was sane, be read to the jury.

Counsel's avowed purpose in offering to read the report of the lunacy commission was to acquaint the jury with the facts on which the lunacy commission based its report. Article 465 of the Code of Criminal Procedure provides that "Every expert witness must state the facts upon which his opinion is based".

■ Defendant's plea of insanity was submitted to the jurors and had to be determined by them. The experts called by the State testified that in their opinion defendant was sane. The jurors had the right to know the facts on which their opinion was based. Aside from the rule laid down in Article 465 of the Code of Criminal Procedure, the settled jurisprudence seems to be that, where expert witnesses give opinion evidence, the facts

upon which they base their opinions must be disclosed to the jury.

■ In this case, the members of the jury did have the benefit of the facts on which the experts based their opinion, because every one of the witnesses previously examined by these experts was called as a witness and testified before the jury. For that reason, it was not necessary that the report and the testimony attached thereto be read. The judge in his per curiam said:

"Counsel is in error in stating that the jury was entitled to hear the record read on which the doctors based their conclusions; the doctors were placed on the stand and gave their opinion and were examined and cross examined by the State and defense, and all of the witnesses were likewise placed on the stand, and it is from that evidence that the jury is to determine whether the defendant was sane or insane."

The judge stated in another part of his per curiam that it appeared that the reason counsel for defendant wanted the report read to the jury was to contradict the testimony of a witness he had called. The witness referred to is Mrs. J. H. Snowden, the mother of defendant, who testified before the lunacy commission that her son as a boy "would go into tantrums, and that defendant had been married three times and could not get along with either wife", etc. She was called as a witness for defendant and testified at the trial that her son as a boy was normal and that he had lived with his second wife without difficulty. The judge in his per curiam

said that, in as much as Mrs. Snowden had been called as a witness for defendant, he could not ·impeach her testimony by reading to the jury the testimony she had given before the commission. The judge was of the opinion that "the only purpose of getting the statement read before the jury was to show that Mrs. Snowden had made a different statement before the commission".

Since the jury had the benefit not only of the testimony of the two experts appointed by the court as a lunacy commission, but of the testimony as well of each and every one of the witnesses interrogated by the members of the commission, the judge did not err in excluding the documents offered by defendant.

The conviction and sentence appealed from are affirmed.

HIGGINS and McCALEB, JJ., concur in the decree.

FOURNET, J., dissents and hands down reasons.

PONDER, J., dissents.

FOURNET, Justice (dissenting).

In this case the defendant was charged with the crime of having shot his wife with the intent to murder her, and his defense was not guilty because of insanity at the time the crime was alleged to have been committed.

It appears that after the jury of five necessary to pass upon the defendant's guilt or innocence had been duly impaneled, the opening statement of the district attorney had been made, and one of the witnesses had testified, the court was adjourned until the following morning, each of the five jurors going their respective ways under order of the court. When the court opened the next morning, and after the jury had been withdrawn from the court room, defendant's counsel moved for a mistrial on the ground that the local newspapers had carried articles to the effect that the defendant, on information that he was carrying a pistol, had been searched in the court room and found to have a razor concealed about his person. This was headlined in one of the articles and mentioned in both of the city's newspapers in connection with comments on the procedure of the trial and the evidence adduced up to the time of adjournment on the first day. Defendant's motion was overruled by the trial judge on the ground that there was no evidence to show the jurors had read the articles; whereupon counsel for the defendant requested that the jury be returned to the jury box and questioned as to whether or not they had read the articles. This was done and two of the jurors answered in the affirmative, one having read the article carried in the Shreveport Journal, the other having read the article carried in the Shreveport Times. The court then instructed the jury that the articles were erroneous in point of fact and that they should disregard them and try the case on the evidence adduced at the trial alone. With this admonition, he again refused the defend-

ant's motion for a mistrial, being of the opinion that the articles, having in no "way influenced the jury and no prejudice being shown, the defendant was not entitled to a mistrial."

In his per curiam, the trial judge declared, further, that:

"On the trial the state showed that defendant called his wife over phone and asked to come out to the house to see her, she refused, if he intended to come out and raise a controversy; defendant then armed himself and went to the house and shot his wife after she asked him where was their automobile, 'has your sweetie got it'. He then shot her. The defendant testified that his wife called him over phone and told him if he knew what was good for him he had better come out to the house. After the trial one of the jurors (one who had read the article) stated that if the statement of the prosecuting witness was correct defendant was guilty as charged; but if the defendant's statement was correct, he had the right to arm himself, and since it was the word of one against the other, they gave the benefit of the doubt to the defendant and found him guilty of shooting with intent to kill. I understand that this juror also stood out for finding the defendant insane. The verdict, in my opinion, should have been guilty as charged. I am satisfied that the articles in the newspaper did not influence the' jury to find a verdict of guilty."

Counsel for defendant contends and seriously argued here, both orally and in' brief, that the articles published in the two Shreveport papers were prejudicial on their face and that it would have been impossible to have shown, with any degree of reasonable certainty, what effect such articles might have had on the minds of the jurors who read them, especially under the peculiar facts of the case.

In the majority opinion it is stated: "There is nothing to show that the juror who read the article in the Shreveport Journal had mentioned that article to the other four, nor is there anything to show that the juror who read the article in the Shreveport Times had mentioned that article to the others. Counsel for defendant suggests that the presumption is that the two jurors who had read the articles had related to the others the substance of what they had read. Assuming, however, that they had, the fact is that no attempt whatever was made by counsel for defendant to show that the articles in the newspapers had influenced the jurors in the slightest degree. * * * If it be conceded, as counsel argues, that the articles are prejudicial in their nature, the fact is that counsel for defendant neither showed, nor attempted to show, that the jurors who read them paid any attention to them or that the reading of them influenced the jurors in the slightest degree in reaching a verdict. Counsel for defendant made no attempt to show injury. We cannot assume injury when none is shown. On the contrary, under the facts shown, we must assume that defendant was not injured." The conclusion is then drawn that such injury as may have been sustained was cured by the statement of the judge to the effect that the facts carried in the newspaper articles were incorrect and were to be disregarded by the jury. In sup-

port of this conclusion, the following authorities are cited: 2 Marr's Criminal Jurisprudence 1189, Section 770; State v. Hoffman, 120 La. 949, 45 So. 951; State v. Alvarez, 182 La. 908, 162 So. 725; State v. Green, 185 La. 175, 168 So. 766; State v. Taylor, 192 La. 653, 188 So. 731; and State v. McClain, 194 La. 605, 194 So. 563.

My appreciation of the foregoing authorities is that they do not uphold the view expressed in the majority opinion, and I cannot subscribe to the same.

The impartiality with which a jury decides a case on the evidence as presented in the court room and the freedom of the juror's mind from any bias or prejudice are, in my opinion, the most important features of a trial by jury under our system of government. In order that all possible fairness may be accorded the accused, it is eminently important that the jury approach the case with an open mind, free from any outside influences whatsoever. It is for this reason that jury deliberations have always been so closely guarded in this country. Whether or not the jurors who read the articles printed in the Shreveport newspapers mentioned them or their contents to any of the other jurors, is immaterial. If the reading of the articles might have had any effect whatsoever upon the minds of the jurors who read them, or might have influenced their decision as to the defendant's guilt or innocence, whether on account of his insanity at the time of the commission of the alleged crime, or otherwise, would alone be sufficient to vitiate the verdict. See Harrison v. United States, 6 Cir., 200 F. 662, 119 C.C.A. 78; State v. Tilden, 27 Idaho 262,

147 P. 1056; Capps v. State, 109 Ark. 193, 159 S.W. 193, 46 L.R.A.,N.S., 741, Ann.Cas. 1915C, 957; Styles v. State, 129 Ga. 425, 59 S.E. 249, 12 Ann.Cas. 176; People v. Wong Loung, 159 Cal. 520, 114 P. 829; Perry v. People, 63 Colo. 60, 163 P. 844, L.R.A.1917D, 921; State v. Caine, 134 Iowa 147, 111 N. W. 443; State v. Walton, 92 Iowa 455, 61 N.W. 179; Cartwright v. State, 71 Miss. 82, 14 So. 526; Hare v. State, 4 How., Miss., 187; and Palmer v. Utah & N. Railway Co., 2 Idaho, Hasb., 315, 13 P. 425, 429.

As was aptly stated in the case of People v. Stokes, 103 Cal. 193, 37 P. 207, 208, 42 Am.St.Rep. 102, where a new trial was sought on the ground that the jury had read an article in a local newspaper containing a report of some of the evidence in the case, given at the trial: "* * * conceding that the article was read by them [the jurors], they could make no showing that would relieve them of the effects of their own misconduct. A juror is not allowed to say: 'I acknowledge grave misconduct. I received evidence without the presence of the court. But those matters had no influence upon my mind when casting my vote in the jury room.' The law, in its wisdom, does not allow a juror to purge himself in that way." (Brackets mine.) See, also, Wright v. Eastlick, 125 Cal. 517, 58 P. 87; People v. Chin Non, 146 Cal. 561, 80 P. 681; and People v. Azoff, 105 Cal. 632, 634, 39 P. 59.

I am further of the opinion that it was not incumbent upon the defendant to show that the jurors reading the articles were influenced by them, for that would be almost impossible. It is doubtful that the jurors

who read these articles could themselves definitely disregard what they had read or could state just what effect it had on their decision. See, People v. Leary, 105 Cal. 486, 39 P. 24; Grant v. Varney, 21 Colo. 329, 40 P. 771; People v. Lee Chuck, 78 Cal. 317, 335, 20 P. 719, 726; and People v. Conkling, 111 Cal. 616, 44 P. 314.

In the Leary case the court said: "If the matter * * * be such as would from its character, or the manner or connection in which it is stated, be calculated to prejudice or injuriously affect the minds of the jury, a *presumption* of improper influence arises, and a new trial will be granted, without requiring defendant to show that harm has in fact been done his cause." (Italics mine.) This rule is announced in the Conkling case [111 Cal. 616, 44 P. 318] in the following manner: "Jurors cannot be permitted to investigate the case outside the courtroom. They must decide the guilt or the innocence of the defendant upon the evidence introduced at the trial. It is impossible for this court to say that this outside investigation did not affect the result, as to the character of the verdict rendered; for, when misconduct of jurors is shown, it is presumed to be injurious to defendant, unless the contrary appears."

The case of Grant v. Varney, supra [21 Colo. 329, 40 P. 775], was a civil case, but what was said in that case applies likewise to criminal cases, where the rule is infinitely more important. In the Grant case the court expressed the rule in the following way: "The most impartial minds and the most honest men find it difficult to decide correctly and fairly the complicated questions of fact that are submitted for their determination in a lawsuit, without having thrown into the balance that which naturally appeals to passion and prejudice. When such foreign influences are brought to bear upon either trained or untrained minds, it is difficult to tell just what effect they have. Whatever be the merits of his cause, every man is entitled to a fair and impartial trial in courts of justice, according to the established rule of judicial procedure."

In the case of Perry v. People, supra [63 Colo. 60, 163 P. 846], a situation similar to the one existing in the instant case was presented. The court said: "Who can look into the conscious or unconscious mind of each one of the * * * jurors and say that no one nor all of these were prejudiced by this untruth, which came to them with the color of truth. It is difficult to understand how the average man can receive information from what he may regard as a reliable source to the effect that a prisoner has conducted himself as was reported to the jurors in this case without some impression, at least, that the prisoner was a man of criminal intent and purpose."

It is my opinion that in disposing of matters of this kind, the query should be relegated to the nature of the article and the possibility of its effect or influence on the jury or any member thereof, and it follows, as a necessary result, that in order to determine whether or not the jury might have been influenced, the facts of the particular case must be taken into consideration.

In the case of Perry v. People, supra, the court declared that according to the "overwhelming weight of judicial opinion" the

test is "not that the jurors were actually prejudiced by the extraneous matter, but whether or not they might have been so prejudiced. That is to say, if the purity of the verdict might have been affected, it must be set aside; if it could not have been affected, it will be sustained. A verdict upon which doubt rests cannot be sustained."

During the trial of the instant case, evidence was introduced to show that for some time prior to and up to the time of the shooting, the defendant had been taking "barbital and amytal" to relieve the severe pain from which he had been suffering as the result of an operation on his jaw bone in the removal of his teeth, which were fused to the bone. It was also shown by evidence that shortly before the shooting the defendant had been acquitted of a charge of drunken driving when it was proved that he had been driving under the influence of these drugs, which had been administered to him by his wife's own sister.

Under these circumstances, for articles to appear in the newspapers, particularly one headlined in large letters "Razor Found on Snowden When He Arrives in Court," it is impossible to assume or presume as to just what effect such articles might have had on the minds of the jurors who read them. The incident related by the trial judge in his per curiam furnishes its own example. There can be no certain method of ascertaining what was in the juror's mind to make him fluctuate between belief and disbelief of the defendant—to vacillate from one extreme view to the other with respect to the defendant's sanity—and while the

trial judge was himself convinced the verdict should have been "guilty as charged" and was also satisfied in his own mind that the articles in the newspapers did not influence the jury in arriving at its verdict of guilty, nevertheless, these conclusions are within the peculiar and exclusive province of the jury, to be arrived at with a free and open mind, unbiased by any undue outside influence whatsoever. See People v. Wong Loung, 159 Cal. 520, 114 P. 829, 832, cited above.

In the Wong Loung case the attorney general contended "that the court had the right to consider 'the conduct, degree of intelligence, and appearance of each juror, including juror Bartholomew [the juror to whom the newspaper article complained of had been read by his wife], as witnessed by him throughout the trial, in determining whether the irregularity complained of warranted the conclusion that the accused had been prejudiced in his rights, or whether the showing required that the verdict be set aside and a new trial granted,' and he insists that the court's conclusion, based upon such considerations, that 'no improper influence had affected the verdict,' should stand." (Brackets mine.) In disposing of these contentions, the court said: "We know of no rule of law whereby a court is presumed to make such a study of jurors as would enable the judge to say whether or not any particular trier of a case would be influenced by the reading of any article in a newspaper. * * * It would be absurd to presume that the court carried a mental picture of the juror and a close recollection of his demeanor at the trial during all of

that time. Upon a showing of misconduct such as was here demonstrated, *the law presumes prejudice and this presumption cannot be overcome by a counter conclusion based upon a mere conjecture that the court knew the mental and moral characteristics of juror.* The presumption of injury from such misconduct is so well established in this state as to need citation of but few authorities." (Italics mine.)

The policy of the law on this phase of trial procedure was very ably and concisely stated by the Chief Justice of the State of Mississippi over a hundred years ago in the case of Hare v. State, reported in 4 How., Miss., at page 187, a case that is still quoted with approval by the leading authorities on this subject. The language used by Chief Justice Sharkey is as follows:

"Whilst the law is rigidly vigilant in guarding and preserving the purity of jury trials, yet it will not for light or trivial causes, impugn the integrity of juries, or question the solemnity and impartiality of verdicts. But if the verdict be given under circumstances which might conduce to an improper influence, or the natural tendency of which might be to produce bias or corruption, it cannot then be said to be above suspicion; and if it be not, it must fall short of that perfection which the law requires, and which under a more guarded administration, it is capable of producing. It is not necessary that any attempt should be made to bias the minds of the jurors, or that any pernicious influence should be exerted. The door to tampering is to be closed; this is the only security; for if it be left open, it may be

predicted with certainty, that the evil consequences will fall some where."

I therefore respectfully dissent from the majority opinion.