352 So.2d 649 (1977)
STATE of Louisiana
v.
Stanley SULLIVAN, Sr.
No. 59639.
Supreme Court of Louisiana.
November 14, 1977.
Rehearing Denied December 14, 1977.
*651 Emile M. Weber, Weber & Weber, Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Lennie F. Perez, Marilyn C. Castle, Asst. Dist. Attys., for plaintiff-appellee.
SUMMERS, Justice.
A bill of information filed on February 19, 1975 charged appellant Stanley Sullivan, Sr., with the attempted armed robbery of Leon Ford on July 12, 1974. La.Rev.Stat. 14:27 & 14:64. Sullivan has lodged this appeal from a jury verdict of guilty and a sentence of twenty-five years at hard labor without benefit of parole, probation or suspension of sentence. Twelve errors are assigned.
A brief outline of the facts will facilitate an understanding of the issues presented. Leon Ford, the victim, received a phone call at eleven o'clock on the night of July 12, 1974 from someone representing himself to be a police officer. He was told to come to the police station to pick up his son who had been arrested. As Ford left his house for the police station, he was hit on the head with a club by one of two young men lying in wait for him. Ford fell to his knees, but he retained consciousness. Before he could recover, his assailants fled. An outside light enabled Ford to recognize his assailants as Terry and Stanley Sullivan, Jr. They were members of a family who had been his neighbors in the past. Ford had been acquainted with the entire Sullivan family for eight years.
The State charged appellant, the father of those two young men, under the theory that Terry and Stanley Sullivan, Jr., with two acquaintances, Marty Williams and Lane Landry, devised a plan to get money by robbing Leon Ford. All four were teenagers. The plan was initiated by Terry Sullivan because he needed money to get married, although he was only fifteen years old at the time. Because Leon Ford, the intended victim, knew them they decided to disguise themselves by applying a heavy cream to their faces.
Having decided on this plan outside the house trailer where the Sullivans lived, they entered the house trailer and walked into the bathroom to apply the makeup. The elder Sullivan joined them in the bathroom where he learned of their plan. He then told them how to hit Ford on the head in order to knock him unconscious and further instructed them how to rifle the victim's pockets, search for his money and otherwise successfully execute the proposed robbery.
After the disguise was applied, all five of the conspirators left the trailer house in a pick-up truck belonging to Landry. They drove out to the vicinity of Ford's house in a rural area. The plan was for Marty Williams to approach the Ford house, knock on the door, and when Ford appeared, grab him and yank him out of the house, at which time Terry Sullivan would "clobber" Ford on the head with a club. Appellant Sullivan, Sr., Kenneth Landry and Stanley Sullivan, Jr., were to pick up Marty and Terry after the robbery and make their get-away. But the plan aborted. Marty *652 became scared and couldn't go through with it. So Marty and Terry rejoined their confederates at the truck where Sullivan, Sr., waited. He berated and cursed Marty for his cowardice, saying his boys would have to do it all.
The conspirators then concocted an alternate plan which involved a telephone call to Ford in which they would pretend to be the police at Denham Springs who were holding Ford's son; then, when Ford left the house to go for his son, all four of the younger men would assault and rob him; the elder Sullivan would be waiting in the truck on the nearby highway where they would meet him and make their get-away. However, as the factual outline discloses, the alternate plan also aborted. When the attempted robbery failed, the confederates joined Sullivan, Sr., at the truck, and they returned to the house trailer together, empty handed.
Lane Landry and Marty Williams pled guilty to attempted simple robbery and were witnesses for the State at the trial of appellant.

Assignment 1
In his opening statement to the jury the prosecutor said, "So the State will shoulder its burden of proof and call witnesses in here to testify to facts, not testify against Mr. Sullivan, testify for Mr. Sullivan."
Defense counsel argues that the prosecutor was deliberately attempting to present only enough facts to confuse the jury and to compel appellant, a simple, pathetic alcoholic, to take the stand on his own behalf and to call his two sons in his defense. This, it is reasoned, would give the prosecutor an opportunity to insinuate that the two Sullivan boys would lie for their father.
In our view this assignment and the tenuous argument made to support it are afterthoughts, for no contemporaneous objection was made to the prosecutor's statement, and the defense argument is otherwise not well-grounded. The State did call the victim Ford, Lane Landry and Marty Williams, three of the principals in the transaction upon which this prosecution is based. In addition, the State called other witnesses who testified to circumstances surrounding the offense.
No fault can be properly attributed to the State's failure to call the Sullivan boys as witnesses against their father. Their testimony and natural bias as defense witnesses made it abundantly clear that they would and did testify in favor of their father. If, as a result of this development, there was insinuation by the prosecution that the Sullivan boys lied, it was warranted by the contrary testimony of the victim, Williams and Landry and the other facts and circumstances of the case. The defense has cited no authority to support its position and our research disclosed none. The defense contention seems to be based upon the principles announced in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). But that case denounces the withholding of exculpatory evidence known to the State and unavailable to the defense, a situation entirely alien to the facts of this case.
This assignment is without merit.

Assignment 2
When the trial resumed on the second day, defense counsel, out of the presence of the jury, objected to allowing Lane Landry to testify on the ground that the rule of sequestration had been violated. An effort was made to show that Lane Landry's mother and wife, who were not sequestered witnesses, sat in the courtroom listening to Marty Williams testify. They then went into the hall, according to the defense, and discussed Williams' testimony with Lane Landry before he was called to testify. As a result, defense counsel contends that the testimony of Landry and Williams could be structured without inconsistencies.
Landry, his mother and his wife all testified that although they spoke to one another in the hall outside the courtroom where the witnesses were sequestered, no one told Lane Landry anything about Marty Williams' testimony.
*653 Based upon this contradictory testimony presenting an issue of credibility, the trial judge permitted Lane Landry to testify. Such a ruling was obviously based upon the testimony of the Landry witnesses that the rule of sequestration had not been violated. There is no error in the ruling. Indeed, it is the prerogative of the trial judge to reconcile contradictory testimony, and his determination in this regard will be accorded great weight on review. La.Code Crim.Pro. art. 764; State v. McKinney, 302 So.2d 917 (La.1974).

Assignment 3
At the close of the State's case on July 29, 1975, defense counsel moved for a directed verdict specifically urging that the State had failed to support the charge of attempted armed robbery in that there was no proof that a dangerous weapon had been used and because there was no evidence of specific intent of two essential elements of the crime.
The record shows that a two-foot-long stick, an inch or two in diameter, was wielded by appellant's confederate with sufficient force to cause profuse bleeding from the victim's head and bring him to his knees.
Article 64 of the Criminal Code defining armed robbery requires that there be a theft "by use of force or intimidation, while armed with a dangerous weapon." And, in order to be convicted of an attempt to commit armed robbery, a person must have a specific intent to commit the crime and must do an act tending directly to accomplish his object, even though he does not accomplish his purpose. La.Crim.Code art. 27.
The outline of facts together with the State's theory of the case, which is supported by evidence in the record, is some evidence of the fact that force with a dangerous weapon was used on the victim in order to rob him. Insofar as specific intent is concerned, we believe that the record discloses some evidence of circumstances indicating that appellant actively desired that a theft be committed by use of force with a dangerous weapon. Proof of the subjective element of intent is necessarily inferred from circumstances. La.Rev.Stat. 15:445. Hence there existed in appellant a state of mind which supplied the specific intent necessary to satisfy that element of the crime of attempted armed robbery. La.Crim.Code art. 10.
When the defense asserts that the judge committed reversible error in denying his motion for a directed verdict of acquittal, this Court will not overturn the conviction unless there is no evidence at all of some essential element of the crime. State v. Clark, 340 So.2d 1302 (La.1976); State v. Smith, 332 So.2d 773 (La.1976); State v. Butler, 331 So.2d 425 (La.1976); State v. Kaufman, 331 So.2d 16 (La.1976).
There is no merit to this assignment.

Assignment 4
This is another allegation that error occurred because the prosecutor failed to call witnesses favorable to appellant; presumably, the argument refers to the State's failure to call the Sullivan boys. The contention is that the prosecutor's opening statement indicated that he would call witnesses favorable to appellant. In effect this assignment is, as the defense brief concedes, an "extension" of Assignment 1. As pointed out in Assignment 1, the Sullivan boys were called by the defense, and we can perceive no prejudice to the defendant because they were not called by the State even though the State's opening statement may have indicated that it was the State's intention to do so. No evidence favorable to the defense was withheld. A conclusion that prejudice resulted improperly would be speculation and conjecture.

Assignment 5
Terry Sullivan was called as a witness by the defense. On cross-examination, the prosecutor sought to impeach his testimony by showing that prior to trial Terry told the police of two trips to Ford's house on the night of the robbery, whereas at the trial Terry said only one trip was made. *654 He asked Terry if, when the police picked him up the second time, between Friday and Saturday, his head was "straight" (meaning free from narcotic influences), when he talked to Lieutenant Tycer. He was then asked if he told Lieutenant Tycer and Sergeant Robertson that they (the confederates in the attempt to rob Ford) had gone to Ford's house and that Marty had "chickened out". To which Terry replied, "I don't know if I did or not. I know we went up there once. Anybody can say something when they are messed up. I know I have plenty of times."
The next question was, "So you do not admit telling Lieutenant Tycer and Sergeant Robertson that y'all went out there and that you chickened out, somebody had chickened out, is that right?"
Terry answered: "I don't know. I know we went up there once though."
Interrogation continued: "Okay. Do you recall this part of the conversation? Tycer: Did y'all not thought to do it earlier and y'all chickened out as you say? Sullivan: Yes, sir. Tycer: And what happened that time?"
Defense counsel then objected that a proper foundation had not been laid to impeach the witness by a prior contradictory statement. Thereupon the trial judge permitted the State's attorney to resume questioning to lay the foundation for impeachment. The prosecutor therefore resumed interrogation and asked the witness whether he recalled making the statement downstairs in the sheriff's office. He answered: "I don't know."
With the issue thus formed the trial judge ruled that the statement could be used for impeachment. This ruling is assigned as error.
The witness was asked whether he made the statement, his attention was called to the time, place and circumstances, and to the person to whom the alleged statement was made and the witness did not distinctly admit making the statement. Therefore, evidence that he did make it is admissible. La.Rev.Stat. 15:493; State v. Governor, 331 So.2d 443 (La.1976). The State having substantially fulfilled the requirements of Section 493 of Title 15 of the Revised Statutes,[1] the witness had sufficient information and an opportunity to explain the discrepancies between his testimony at trial and the prior statement. The purpose of the law is satisfied under these circumstances.
There is no error in this assignment.

Assignments 6 and 8
While Terry Sullivan was being cross-examined by the State's attorney, he was asked whether he had talked to three deputies at the Ryan Airport office of the parish prison. He answered, "Yeah, about another case." This response had no reference to the defendant or the case at bar. When questioned whether he had made certain statements to the officers relating to the case at bar, Terry said, "We didn't even talk about that robbery case out there. This is [was] about another case."
Thereafter, on recross-examination Terry said the interrogating officer, referring to the part he and his father played in the robbery, told him "you're going to the electric chair, the gas chamber or in a little dark room . . . ."
On direct examination Officer Callander testified that on the occasion when Terry was interrogated at the Ryan Airport prison office, Terry told him that his father was involved in the robbery but that he did not pursue the questioning in detail because he was there to take a statement on another case.
*655 In none of these instances which the defense contends violated the proscription against reference to other crimes, La.Rev.Stat. 15:446, was reference made to the defendant or the case then on trial or anyone even remotely connected with the trial. These were simply unsolicited statements made by the witnesses in explanation of the answer they gave to a permissible question.
These references to "other cases", if they could be considered references to another crime committed by defendant as to which evidence is not admissible, were not remarks made by the judge, district attorney or a court official. As such they furnish no grounds for a mistrial and no error occurred. Furthermore, the defense must move for a mistrial to take advantage of an error in this respect. No such motion was made. La.Code Crim.Pro. art. 770; State v. Lepkowski, 316 So.2d 727 (La.1975); State v. Lewis, 315 So.2d 626 (La.1975).

Assignment 7
Upon resumption of trial after an overnight recess, some of the jurors were asked if they had discussed the case with anyone or read about it in the newspapers during the recess. The juror Cassano said that he had been approached on the sidewalk that morning by a stranger, a man who asked if he thought appellant was guilty and whether he put his two sons "up to it." Cassano replied, without stopping, that he couldn't say and hurried away. He believed the man was merely curious.
The trial judge questioned Cassano at length and determined from him that no threats were made, no undue influence had been exerted and Cassano was not affected by the purely fortuitous incident. Cassano was accordingly permitted to continue serving as a juror. Aside from the fact that the record does not support a finding that "prejudicial conduct occurred in or outside the courtroom", no motion for a mistrial was made as Article 775 of the Code of Criminal Procedure requires. Cf. State v. Snowden, 198 La. 1076, 5 So.2d 355 (1941); State v. Hoffman, 120 La. 949, 45 So. 951 (1908).

Assignment 9
Again the defense urges as error the failure of the trial judge to direct a verdict of acquittal, contending that "the complete record indicates that the elements of the crime [were] not met as to the accused." Reasons assigned for finding Assignment 3 to be without merit are applicable here.

Assignment 10
There is no merit to a complaint that the judge erred in accepting a verdict of "guilty" after specifically instructing the jury that it was to return one of the following four verdicts: 1) guilty of attempted robbery; 2) guilty of attempted simple robbery; 3) not guilty by reason of insanity; and 4) not guilty.
While it is true that the judge's verbal instructions to the jury did refer to "guilty of attempted armed robbery" as one of four permissible verdicts, when the trial judge furnished the written list of responsive verdicts to the jury as he is instructed to do by Article 809 of the Code of Criminal Procedure, they were listed as: 1) guilty; 2) guilty of attempted simple robbery; 3) not guilty by reason of insanity; and 4) not guilty. Handing this list of permissible verdicts to the jury following the oral instructions avoided any confusion in the jury's mind regarding the proper verdicts. Such a list was moreover, in precise keeping with the responsive verdicts authorized for a charge of attempted armed robbery by Article 814 of the Code of Criminal Procedure. As Article 810 declares, "there shall be no formal requirement as to the language of the verdict except that it shall clearly convey the intention of the jury." In this instance the verdict did clearly convey the intention of the jury.

Assignment 11
Because appellant is fifty years old and no gun was used in the attempted robbery, the defense contends the trial judge abused his discretion in imposing a sentence of twenty-five years at hard labor, *656 with credit for time served, without benefit of parole, probation or suspension of sentence.
Although the minutes record that appellant informed the court that his age was 39 and that he was born November 22, 1936, the claimed discrepancy between the minutes and the representation that he was 50 years old was undoubtedly taken into consideration by the trial judge who observed appellant at trial and had the benefit of a presentence report.
When consideration is given to the fact that the trial judge was authorized to impose a maximum sentence of 49½ years, the 25-year sentence is not excessive under the facts of this case, for it fell within the authorized limits. La.Crim.Code arts. 27 and 64.

Assignment 12
"You are duty bound to follow the law as I give it to you in these instructions," the judge said to the jury. Such a statement, it is contended, is violative of Article XIX, Section 9, of the Constitution of 1921, requiring that "The jury in all criminal cases shall be the judges of the law and of the facts on the question of guilt or innocence, having been charged as to the law applicable to the case by the presiding judge." In addition to the fact that this 1921 constitutional provision relied upon was inapplicable to the trial of this case in July 1975, at a time when the Constitution of 1974 was in effect, no contemporaneous defense objection was made to the trial judge's instructions. La.Code Crim.Pro. art. 841. To the contrary, at the conclusion of his instructions and before retiring the jury to deliberate, the trial judge inquired of defense counsel if there were further instructions which should be given. Defense counsel replied there were none. The instruction is one that has been repeatedly approved by this Court. La.Code Crim.Pro. art. 802. State v. McLofton, 145 La. 499, 82 So. 680 (1919).
There is no merit to this assignment.
For the reasons assigned, the conviction and sentence are affirmed.
NOTES
[1] La.Rev.Stat. 15:493:

"Whenever the credibility of a witness is to be impeached by proof of any statement made by him contradictory to his testimony, he must first be asked whether he has made such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible."